**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00205-CR**
_____

**WAYMON NICHOLAS JORDAN JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 20-02-02178-CR**

**MEMORANDUM OPINION**

A jury convicted Waymon Nicholas Jordan Jr. ("Jordan") of capital murder for shooting Devin Rash ("Rash") and Ryan York ("York") in a single transaction. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A), (b). The trial court sentenced him to life without parole. *See id.* § 12.31(a)(2). On appeal, Jordan raises thirteen issues challenging: (1) the sufficiency of the evidence; (2) the denial of his motions to suppress; (3) certain evidentiary rulings; and (4) the trial court's refusal to include

1

his requested instructions in the jury charge. We affirm the trial court's judgment for the reasons discussed below.

## BACKGROUND

Rash was a marijuana dealer, and Jordan was a repeat customer. On the morning of February 12, 2020, Jordan communicated with Rash through SnapChat and asked to buy two "zips" (ounces) of marijuana. They agreed to a price of $380 and to meet at the Whistle Stop Café parking lot in the River Bend Shopping Center in Montgomery County. Rash arrived at the Whistle Stop in the same car with York and Bryce Smith, who was driving. Jordan undisputedly shot all three men in the head, killing Rash and York almost instantly, but Smith survived. Jordan claimed self-defense and that the three others tried to rob him, so the primary question at trial became whether Jordan's actions were justified. We address the evidence adduced at trial below. We outline the necessary procedural background for the resolution of suppression and jury charge issues later in the opinion.

## TRIAL EVIDENCE

### Testimony of Bryce Smith

Bryce Smith ("Smith") testified that on February 12, 2020, he drove Rash to the Whistle Stop Café to sell two ounces of marijuana to someone, and he did not know Jordan's name at the time. He testified that he also picked up York.

When they pulled into the parking lot, he saw a police car backed in, and they joked about it; Smith said he was a "little bit" worried about it, but they did not cancel the deal. When they arrived, Jordan was already there. They parked between Jordan's truck and a big van. Smith was driving a compact car, Rash was in the front passenger seat, and York was in the back on the driver's side. Smith described Jordan approaching the car,

> So, he walked up to "this" rear door and he opens the door and he looks in. He takes a good look at us, looks me in my face, looks at Devin and makes a comment that, You guys are rolling really deep today and had a really nervous laugh at the end. For you guys that don't know what that means is, that means he just voiced his concern as to how many people we had in the car . . . somebody who knows what that means is that he's not coming with good intentions.

Smith said that Jordan finally got into the car on the back passenger side next to York.

Smith testified that once Jordan got in the car, they talked for a minute – exchanging pleasantries, then Rash asked whether Jordan had the money. Smith explained that when Jordan did not answer, Rash asked, "Hey, man. Do you have the money?" and Smith turned around and looked at him, which is when Jordan pulled out the gun. Smith testified that Jordan shot York first, then Smith, and Rash third. Smith said that he "just kind of assumed" Jordan had no money after they were shot.

Smith explained that when he was shot in the head, he went "through a concussion which is what knocked me out" but did not know how long he was unconscious. When he came to, he saw his friends' heads. He explained that York and Rash were unresponsive. At that point, Smith called Frankie Boyd, Rash's girlfriend, instead of the police, because he thought drugs were still in the car and was worried about getting in trouble. During Smith's testimony, Boyd's 9-1-1 call was played for the jury.

Smith testified that he never knew Rash to sell drugs to strangers or someone he had not checked out. Smith had never seen Rash or York with a gun. Smith denied that they planned to rob Jordan and that York never said anything. He also denied that either he, Rash, or York did anything to put Jordan in fear, like threatening him, raising their voices, or showing weapons.

He vaguely remembered being transported to the hospital and before that tried to tell police what he knew, but at that point, he did not know who had done it. Smith remembered talking to a detective at the hospital and describing the vehicle as a "jacked-up, white F-150" with big wheels. Smith explained that during the investigation, he did not know the shooter's name.

Smith described his health problems since the shooting and admittedly had blank spots in his memory about the shooting. He explained that some of the details he had not told officers before his trial testimony because it "never came up."

4

**Testimony of Officer Jason Tosto**

Conroe police officer Jason Tosto ("Tosto") testified that about 5:20 p.m. on February 12, 2020, he arrived at the River Bend Shopping Center, where the Whistle Stop Café is located. During his testimony, Tosto referred to a map of the shopping center and parking area.

Tosto explained he parked at the primary entrance, so he could follow-up on a prior call and activated his bodycam during that call. While there, he was alerted at 5:29 p.m. to a Priority 1 event by the Conroe Police Department, and he realized he was near the address.

When dispatch informed another officer that Tosto was inside the parking lot where the incident occurred, he checked businesses for any sign of a disturbance and parked cars for people with injuries. After learning the people involved were in a black, Nissan car, he approached one that possibly matched the description.

Tosto testified that he saw at least one person in the driver's seat that appeared distracted and asked if he was okay – the driver shook his head, "no[.]" Tosto observed a body slumped forward in the front passenger seat. When the driver exited to talk to Tosto, he saw another body in the backseat. Tosto explained that he was initially unsure of the driver's involvement but saw an injury and blood on his face. Tosto wanted to help but maintained some distance, since he did not know the

driver's emotional or mental state. The driver asked for help and said he was in pain. Tosto explained he had the driver sit down to contain him and prevent more injury.

Tosto checked the passengers for a pulse, and neither had one. By then, other officers started to arrive. Tosto remembered the front passenger still had his seat belt buckled but remembered nothing in his lap. He removed the front passenger from the car, which his bodycam recorded. Tosto testified that while officers helped, they learned another involved party was no longer on location, so they asked who did it and what happened. Smith told them he did not know the person or what he looked like and just remembered hearing two bangs, then his head hurt.

During Tosto's testimony, his bodycam footage was played for the jury, and it showed Tosto locating the vehicle and Smith's exiting the car with blood on his face and head. It captured York and Rash being pulled from the car and officers performing CPR.

Tosto explained it was important to try to get information from Smith, although seriously injured, "Because at that point, we were under the impression there was another involved party that was no longer on location, and we needed names, descriptions, vehicles, any information he could give us so we could continue to follow with that investigation." Tosto later learned the shooting happened while he sat in the parking lot, but he did not hear the shots, and no vehicles caught his attention. He learned that some businesses, including the Makeup Junkie store, had

surveillance footage, which was played for the jury and showed a white, lifted Ford F-250 pickup truck leaving the parking lot.

Tosto testified that he later transported a person of interest from Willis to the Conroe Police Station. He testified that the person was not under arrest or in handcuffs, and he walked the person through the police station's front door. Tosto did not know the individual's name, "just that he was a person of interest." Tosto testified he did not ask him any questions during the transport other than "personal music choices."

Tosto was familiar with the concept of a "drug rip." Tosto explained that "a drug rip is a prearranged deal for the sale of narcotics that has gone in a different way . . . essentially, you come with the drugs, I come with money. I don't have the drugs, but I'm going to take your money." Tosto testified that marijuana is illegal in Texas.

**Testimony of Ralph Horne**

Officer Ralph Horne ("Horne") with the Conroe Police Department testified. He previously worked as a crime scene investigator (CSI) for about ten or eleven years. Horne testified that about 5:30 p.m. on February 12, 2020, he was dispatched to River Bend Station Shopping Center and was the on-call CSI. When he arrived, Horne took photographs to document the scene, which included photographs of Rash's and York's bodies.

Horne remembered Smith trying to explain what happened. He discussed two photographs that showed the parking lot with the black Nissan and a box truck with Rash lying outside the passenger door and another that showed a cell phone next to Rash. Horne collected the cell phone as evidence and gave it to Investigator Cook.

Horne explained he processed the black Nissan for evidence. Horne said the windows of the vehicle were rolled up, but the doors were open, and the car was running. Nothing outside the car drew his attention, except he "noticed there were no bullet defects in the car." Horne observed two deceased males from gunshot wounds and learned the shootings took place inside the car. He also knew at least three shots had been fired.

Horne also processed the vehicle and found shell casings. He found the first shell casing behind the driver's seat and the second under the driver's seat. He explained that Investigator Carey found a third shell casing consistent with the first two, when he removed the vehicle seats for a court demonstration. He explained that a revolver does not discharge casings, so they knew they were looking for a semiautomatic. Horne testified they also found a duffel bag containing $3,600 in the front passenger floorboard and "lots of blood in different areas of the vehicle." He did not find any marijuana at the scene.

They believed the shooter sat in the rear passenger seat, so they collected DNA swabbing from that seat.

8

Horne testified that he was asked to photograph Jordan, collect a gunshot residue kit on his hands, and collect DNA from inside his mouth for comparison purposes. Horne testified that Jordan did not have any injuries. The DNA sample and gunshot residue test were done per a signed consent, which was admitted into evidence.

Horne prepared a search warrant for an address on Canyon Hills Drive, which a judge signed. They executed the search warrant and looked for a firearm and clothes. Horne described the evidence collected at the house and showed the jury photos. Horne testified there was a white F-250 pickup truck in the driveway. Horne discussed photographs of the truck and described a lifted white F-250 with a large bumper and brush guard. In Jordan's room there was a black energy drink can on the nightstand, which had a hidden compartment where they found .2 ounces of marijuana. Horne was unaware of two ounces of marijuana being found at the house.

In the top dresser drawer, they found a knife and .22 caliber GSG Firefly semiautomatic pistol, which they collected and aligned with the shell casings found in Smith's car. Horne testified they found a magazine containing seven bullets. The shell casings from the vehicle and ammunition pulled from Jordan's gun were both stamped with a "C" manufacturer's logo. Horne said that in the closet, they located a carboard box with a hoodie and pants. Horne processed Jordan's clothes, and a

spot on the pants had a presumptive positive test for blood. They collected a sample and sent it to the DPS lab for testing.

**Testimony of Detective Raymond Adams**

Raymond Adams ("Adams") is a detective with the Conroe Police Department, and on February 12, 2020, he was assigned to investigate the River Bend Shopping Center shooting. His partner, Detective Benjamin Mitchell, also responded to the scene. Adams spoke with Officer Tosto to find out where each person had been in the vehicle. Adams spoke to the 9-1-1 caller, Frankie Boyd.

Adams explained he got Rash's cell phone from the crime scene unit, which recovered it from underneath Rash's leg. Adams accessed the cell phone using a passcode Boyd provided. Based on conversations with Boyd, Adams looked at SnapChat messages and located messages from that day. Adams testified he was most interested in SnapChat messages between Rash and someone with the username "nickjordan00." Adams explained those messages were from that date, referenced meeting at the Whistle Stop, and were very recent. He testified that he had a CSI photograph Rash's conversation with nickjordan00. In the SnapChat messages, nickjordan00 said he was driving a "lifted" or "jacked up" white truck. The messages included vehicle descriptions, and Rash directed nickjordan00 to park near a box truck on the south end of the parking lot. Adams explained the SnapChat messages drew his focus to nickjordan00, because it was clear he was the buyer.

10

Adams sent an officer to the hospital to meet Smith, and that officer relayed a suspect description by radio of "a single, white male in a white, lifted Ford truck." By that time, Adams had a username of nickjordan00, and a white male driving a jacked-up Ford. Adams gave the SnapChat username to deputies from the Montgomery County Violent Offenders Task Force to process. They also had another detective look for surveillance video of the truck, and she found an image of a white, "jacked-up" Ford. Adams testified they then forwarded nickjordan00 and a white, jacked-up Ford truck to the Real Time Crime Center. The Real Time Crime Center provided a possible match for the username, which was "Waymon Nicholas Jordan with a birth date in 2000[,]" and "[t]hey did link a white Ford truck to him." Adams explained that the Real Time Crime Center provided a truck license plate, and the vehicle was registered to Gerald Williams, who was listed as a contact on bond paperwork for Jordan and probably a family member. The Real Time Crime Center also provided two Willis addresses, one on Ranch Road and the other on Canyon Hills Drive, so they sent teams to both addresses to look for the white truck. Officers located the truck at the Canyon Hills address. The jury was shown a photograph of the truck, and Adams explained that "the Montgomery County Real Time Crime Center gave a license plate hit that had an image of the truck," with "the same rims as that still shot from Makeup Junkie. It has the same fender and door decals, as well as a large, front/rear bumper and an in-bed toolbox."

11

While Adams testified, photographs of the SnapChat messages between Rash and nickjordan00 were admitted into evidence. Adams testified that Rash's phone showed "Nick Jordan" was associated with the username nickjordan00 and listed on Rash's "friend screen." He testified that the messages began about 10 a.m. on February 12, when Jordan asked Rash if he had two ounces of marijuana to sell. The messages showed, and Adams testified, that Rash contacted Jordan around 3 p.m. and gave him a price of $380.

Adams told the jury Rash asked Jordan to meet him at the Whistle Stop Café and to park by the "semi" at the end of the parking lot, which was where they found Smith's car. Adams testified that Rash messaged Jordan he would be in a black Nissan, and Jordan answered he was driving a "jacked up, white Ford."

Adams testified that the Makeup Junkie surveillance video, which was played for the jury, showed the black Nissan arrive and the white truck leave about two-and-a-half minutes later. Adams explained another camera located in a different area of the parking lot captured a white Ford truck with black rims and oversized bumpers arrive at 4:44 p.m. driving north to south, and about 5:17 or 5:18, the black Nissan passed in the same direction.

Adams testified that the white truck belonged to Jordan's stepfather. Jordan had a black, Chevrolet Cobalt, and they learned based on his cell phone data and surveillance footage, he visited the same shopping center earlier that day but drove

the Chevrolet Cobalt. Adams said that the Chevrolet Cobalt was consistent with a vehicle at the house when they executed the search warrant. Surveillance video admitted also showed the Cobalt enter the shopping center at 10:37 a.m., and by 10:51 a.m., Jordan contacted Rash by SnapChat. Adams explained that Jordan and Rash had met at the Whistle Stop before, and Jordan knew Rash liked to do deals there. Messages showed about two weeks before the shooting, Jordan asked Rash if he could give his information to someone who wanted to buy ounces, and Rash trusted Jordan enough to vouch for him.

**Testimony of Billy Ballard**

Deputy Billy Ballard ("Ballard") of the Montgomery County Sheriff's Office testified as a CSI and specialist in digital forensics. Ballard described the two types of software and hardware they use to download cell phones. He described GrayKey software as "more friendly with iPhones and Apple devices" that they used to break passcodes. He explained that when the shooting happened, the Conroe Police Department did not have this software, so he assisted Conroe Investigator Stoney Cook with a device. Ballard collected the device from the scene and returned to the lab where he used GrayKey to unlock the passcode. Cook did not know the owner's name but knew he was deceased and unable to provide a code. Ballard extracted raw data from the device and returned the extraction to Cook, who had software to create a report from the extracted data. Cook requested that Ballard perform a GrayKey

13

extraction on a second device pursuant to a search warrant. Ballard performed the second extraction, and he released the raw data to Cook, who prepared a report.

**Testimony of Stoney Cook**

Stoney Cook ("Cook"), a Conroe Police Department Detective, testified about his prior CSI work on this case. When Cook arrived at the Whistle Stop Café, he immediately processed the cell phones. They collected phones from Smith, Rash, York, and Frankie Boyd, and he performed full extractions for Smith's, Rash's, and Boyd's phones. Consistent with Ballard's testimony, Cook testified that in February 2020, Conroe Police Department did not have GrayKey, but he knew that software could be used to unlock iPhones, so he called Ballard for assistance to unlock York's phone and pull the raw data from it. Cook gave the reports he generated from the phone downloads to Detective Adams.

Later, Cook received Jordan's cell phone, which he downloaded by consent or a search warrant using Cellebrite software. Cook explained that although he successfully extracted Jordan's phone, he had Ballard perform a second extraction on Jordan's phone under the consent and search warrant using GrayKey. Cook testified that Ballard successfully extracted it and returned the data to him. Cook took the Cellebrite extraction he did plus the data he received from Ballard and combined them into one report. During Cook's testimony, the trial court admitted the report for Jordan's phone.

14

**Testimony of Forensic Pathologist Kathryn Pinneri**

Board-certified forensic pathologist, Dr. Kathryn Pinneri ("Pinneri"), testified about the autopsies she performed on York and Rash. Dr. Pinneri discussed the reports she prepared for Rash's and York's autopsies, which were admitted into evidence. Multiple photographs and x-rays were also admitted into evidence during Pinneri's testimony. The defense objected to two photos showing Rash's and York's bodies at the scene and argued their probative value was outweighed by the prejudicial effect. In overruling the objections, the trial court noted that the death investigator from Dr. Pinneri's office took the complained-of photographs, and they were the only two photos of the deceased bodies offered. Pinneri testified that they took many photographs but only introduced twelve.

Pinneri testified that on external examination, she found a gunshot wound by York's right ear. Pinneri explained she did not find any firearm residue on York's skin, and it appeared the bullet went through the collar of his sweatshirt first. Pinneri testified that even if you did not find gunshot residue or stippling, the gun could still be fired at close range. Clothing or thick hair, which York had, might prevent firearm residue on someone. She "recovered the projectile from the left side of the back of the brain[.]" Pinneri said the bullet went from right to the left and from front of the body to the back. Pinneri testified, and her report stated, that York's cause of death was a "penetrating gunshot wound to the head." Her report also noted the manner of

15

death was homicide. She said that the bullet's trajectory through the brain resulted in rapid death, because it went through "major structures." Pinneri explained that the gun's muzzle had to be on the right side of York's body, and it had to be towards the front of York based on the bullet's direction, although she could not say how York was holding his head when the bullet entered. York's toxicology results were positive for marijuana.

As to Rash, Pinneri testified that on external examination, she found a gunshot wound to the right side of his head towards the back of the skull. Pinneri testified she "recovered a bullet and a bunch of fragments from right under the entrance wound . . . as well as from the left, frontal lobe[.]" She explained the trajectory was from back to front and "went a little bit upward, and it went from the right side of the body to the left side of the body." Pinneri said that Rash's death would have been "fairly instantaneous" as the bullet went through the brain stem. Pinneri noted that Rash was blind in his left eye, and if he had turned his head to the left, he could not see someone in the back seat. Pinneri did not find firearm residue on Rash's skin, but based on the amount of hair, she did not expect to find any. She explained that did not mean he was not shot at close proximity. Rash also testified positive for marijuana. Her report revealed Rash's manner of death was homicide, and his cause of death was a "[p]enetrating gunshot wound of the head[.]" Pinneri testified that

16

Rash would have been straight or turned right if the shooter was in the back seat, but she could not know with certainty where Rash held his head when he was shot.

**Testimony of Shane Windsor**

Forensic Scientist Shane Windsor ("Windsor") testified that he works for the Texas Department of Public Safety Crime Laboratory Division in the Firearms and Toolmarks Section. Windsor was the verifying analyst. In this case, a firearm, two fired bullet fragments, and many smaller metal fragments were submitted to the DPS lab. They tested a .22 caliber pistol. They were asked to determine the firearm's functionality and if the two fired fragments and multiple smaller metal fragments could have been fired from it.

Windsor testified that he "agreed with the original analyst and his conclusions that we could not identify or eliminate the two fired bullets as having come from this particular firearm." There were insufficient marks on the bullets' surface to allow for a more conclusive determination. Windsor testified there was an agreement in class characteristics, which meant: (1) the width of lands and grooves were the same; (2) the direction of the twist was the same; and (3) one bullet had an entire surface to use, so the number of lands and grooves was the same. The other fragment was not intact so they could not determine the complete number of lands and grooves. Windsor determined that the magazine on the gun held eleven bullets–ten in the magazine plus one in the chamber. The gun operated correctly, which meant there

17

were no problems with the safeties and every time they squeezed the trigger, the hammer fell, and the firearm discharged. Windsor testified that the ejector on this firearm is on the left-hand side, so the cartridge case would eject to the right.

**Testimony of Detective Benjamin Mitchell**

Detective Benjamin Mitchell ("Mitchell") has collected evidence from many crime scenes. Responding to Windsor's testimony, Mitchell explained that shell casings eject with velocity, and if the spent casing strikes an object, it can rebound or bounce. He noted that how the gun is held also impacts the direction the casing ejects, and he was unaware of any consistency in shell casing trajectory.

On February 12, 2020, he received a call about a shooting and responded to the Whistle Stop Café. Mitchell testified he investigated the case with his partner, Detective Adams. When Mitchell responded to the scene, he collected information, talked to witnesses, obtained videos, obtained information from other teams like crime scene and dispatch, sent investigators to talk to witnesses and victims, and coordinated that information. As other people gathered information, they relayed it to Mitchell and Adams. Mitchell had information from many sources, including CSIs, detectives talking to Smith at the hospital, Real Time Crime Center, detectives getting surveillance video, and cell phone data.

While working the scene, Mitchell received information that a white, "jacked-up" Ford truck was spotted on location. Mitchell saw the SnapChat messages

18

between nickjordan00 and Rash. Mitchell watched the Makeup Junkie surveillance video and saw the white Ford truck. He testified that surveillance captured the white Ford truck on the southern end of the parking lot closer to the Nissan and box truck. Another surveillance camera on the north end of the parking lot captured Officer Tosto and the white Ford truck. Mitchell said the white truck on the Makeup Junkie video matched other information Smith provided at the hospital, and Mitchell saw information about a jacked-up white Ford in the SnapChat conversations between Rash and nickjordan00. No other trucks matching that description were seen on surveillance footage for the relevant timeframe, so Mitchell believed that was the suspect vehicle.

Mitchell described the Whistle Stop scene at 6:30 or 7 p.m. as being "all-hands-on deck" with investigators, patrol, outside law enforcement agencies, the Marshall's office, EMS, medical examiners, DAs, and Conroe PD administration – all with the single goal "[t]o solve this homicide[.]" Mitchell coordinated that effort. Mitchell listed the information he learned from the Real Time Crime Center while he was still at the Whistle Stop scene, including: (1) a match was made between a person named Waymon Nicholas Jordan with a birth year of 2000 and a jacked-up white Ford truck; (2) a license plate reader captured a picture of the truck, which was compared to the Makeup Junkie video from the time of the shooting; (3) two addresses in the Willis area; and (4) one address on Canyon Hills. When Mitchell

19

received the addresses, they sent investigators in unmarked cars to check for a vehicle matching the description. At the Canyon Hills address, investigators found a matching white Ford truck in the driveway.

After locating the white truck, law enforcement moved to a Kroger parking lot in Willis and investigators watched the Canyon Hills address and observed an unknown white male and female leave the residence in a car. Based on the known information, the male matched the description. Specifically, he was white and looked like he could be in his 20s, consistent with a birth year of 2000, and they believed the "00" at the end of the SnapChat username to be a birth year.

Undercover officers followed the car from the Canyon Hills address and relayed their position. That car stopped at a McDonald's across the street "very close" to the Kroger where the officers met. They approached the vehicle at McDonald's to identify the people inside. Mitchell testified stopping them in the drive-through afforded a "tactical advantage" over trying to enter someone's home where they could barricade with firearms and evidence, which is "a lot more dangerous." About five hours elapsed since Boyd's 9-1-1 call to officers approaching this person at McDonald's. Mitchell testified that given the Whistle Stop scene, they were concerned for officer safety, other victims, evidence destruction, and that the suspect may flee or endanger others.

20

Mitchell testified that bodycam footage from McDonald's showed no lights, no sirens, no drawn weapons, and that an officer "casually" approached the passenger side of the vehicle stopped in the drive-through and asked to speak to the person. Mitchell said a white male in the passenger seat "identified himself as Nick Jordan, later identified as Waymon Nicholas Jordan[,]" and before Mitchell left the McDonald's parking lot, he also had a SnapChat name for that person, "nickjordan00." Mitchell testified that information matched SnapChat messages he photographed from Rash's phone. Mitchell testified that when they identified Jordan at McDonald's, they already had the following information: Rash's SnapChat messages telling this person to meet at the end of the Whistle Stop parking lot next to a semitruck, which is where they found the victims' vehicle; that timeframe matched the information Boyd provided and the surveillance video; and the white Ford truck at the Canyon Hills address matched the one on Makeup Junkie surveillance at the scene. They had also confirmed that Waymon Nicholas Jordan was born in 2000.

Mitchell said that when he approached Jordan at the McDonald's drive-through, Jordan was "calm, kind of casual[]" and "not real nervous considering the circumstances." Mitchell said even with all the information they had, the investigation was "still beginning[,]" and they had "[a] lot" to do. Mitchell wanted to give Jordan a chance to provide a statement and wanted a statement from the

21

female with him since they did not know if she was involved. Mitchell did not know at that time whether: Jordan's phone contained messages corresponding to the ones in Rash's phone; Jordan had an alibi; someone else may have been driving the truck; or whether someone else might have used his SnapChat. They were investigating those things, and the next step in the investigation was to speak with him.

Mitchell testified that when he spoke to Jordan, there was a large officer presence, since they were staged at the Kroger across the street. They chose that area because it was near the Canyon Hills address. Mitchell explained that other police officers and prosecutors at McDonald's stood at a distance and allowed the investigators to speak with Jordan. He characterized Jordan's interaction with the smaller group of officers as a "casual conversation." Mitchell testified that when asked to go to the police station, Jordan said he did not want to several times. After Detective Adams could not change Jordan's mind, Mitchell tried to "encourage" so Jordan knew "it was for the importance of this investigation." Mitchell explained, "He was aware that we were conducting an investigation and I informed him it would behoove him to speak with me and we could not continue a thorough conversation while standing in the parking lot of the drive-through at McDonald's." After Jordan again said he did not want to go to the police station and wanted to go home, Mitchell told Jordan it was serious, and he needed to come talk to them. Jordan finally agreed

but said, "If I don't have a choice." Mitchell testified that Jordan was not free to leave at that point.

Mitchell testified that they had interview rooms at the police station and why they were a better place to speak with someone. Mitchell testified that from McDonald's, the interview room at the police station was "under a ten-minute drive[,]" and "two exits from the intersection we are at." Mitchell said it seemed reasonable to interview Jordan at the police station. He testified Jordan was not handcuffed, shackled, told he was under arrest, or interrogated when the officer transported him to the police station. They put Jordan in an interview room about six hours after the shooting. Mitchell testified that before asking Jordan any questions at the police station about the Whistle Stop incident, he read Jordan his Miranda warnings. After Mitchell read the warnings, he asked Jordan if he understood them, and Mitchell's partner again made sure he understood. Mitchell believed that Jordan understood his rights, voluntarily waived those rights, and provided a statement.

During Mitchell's testimony the trial court admitted bodycam of the interaction at McDonald's and Jordan's subsequent interview with police at the station. Jordan objected to his interview and noted objections previously made during a pretrial suppression hearing that taking him from McDonald's to the police station constituted an unlawful arrest without probable cause. Mitchell testified that when he began Jordan's interview, he already knew: (1) about the SnapChat

23

messages; (2) about the white truck; (3) about the Canyon Hills address; (4) about the SnapChat username; (5) that Rash told the person in the SnapChat to meet next to the semi at the River Bend Shopping Center; and (6) that is where Rash's body was found.

When Mitchell asked about the Whistle Stop incident, Jordan told him he never used SnapChat. Mitchell did not believe him, because he provided his username before Mitchell asked the question, and it was inconsistent with the messages on Rash's phone. Jordan denied driving his stepfather's truck and said he never left the house that day. As the video played for the jury, Mitchell was asked without objection multiple times whether Jordan was being honest, and he repeatedly testified Jordan was not being honest.

Jordan told Mitchell during his interview that Rash and Smith started yelling and cursing at him, and York jumped in and grabbed him. Jordan told Mitchell he shot York first in the right side of the head near the temple, which Mitchell explained was inconsistent with him actively struggling with York, but Mitchell did not know if York grabbed Jordan.

Mitchell said that from the driver's seat, Smith could not reach Jordan without crossing through the center of the car, and Jordan shot Smith in the right cheek. Mitchell testified Rash was wearing his seatbelt, his phone was in his lap, and he did not have a weapon. Mitchell said it would have been difficult for Rash to see Jordan

24

if he was blind in his left eye, and Jordan shot Rash in the back of the head on the right side. Mitchell testified that in his professional opinion and based on those things, Rash did not pose an immediate threat to Jordan. Jordan told Mitchell he grabbed the marijuana from the center console before exiting the car and never saw a gun. Mitchell testified that based on his training and experience, searching a car for marijuana after shooting three people was inconsistent with self-defense.

On cross-examination, defense counsel also asked about Jordan's truthfulness. Mitchell responded that Jordan was not truthful during the interview, and he had to work on Jordan to get the story out. Mitchell testified that Jordan said, "You got me. I did it." Mitchell believed Jordan was truthful when he said that. Mitchell testified that Jordan "smirked and then said, 'They tried to rob me, yes.'" In Mitchell's opinion, however, it appeared inconsistent with a robbery. Mitchell testified that Jordan spent three hours "deceiving and minimizing" during the interview.

Mitchell testified they found the gun Jordan used in a drawer, and they found $380 in the pants Jordan said he wore that they collected from his room. Mitchell explained that Jordan told them he hid the marijuana in the woods behind his house, but officers did not look for it. An aerial photo admitted during his testimony showed the wooded area was large.

**Testimony of Paige Hadley**

Jordan's former girlfriend, Paige Hadley ("Hadley"), testified that Jordan went by the name "Nick," and his SnapChat username was "nickjordan00." She said that on February 12, 2020, she gave his SnapChat username to police. That night, she went to Jordan's house where they smoked marijuana and watched a movie and then went to McDonald's. Hadley estimated Jordan had an ounce of marijuana, and they only smoked a small amount. During Hadley's testimony, her text messages with Jordan were admitted into evidence, which she discussed. The messages showed that she offered to buy marijuana on the way to Jordan's house that night, but he told her he already had some. Hadley explained this surprised her, because he was unemployed, and it was uncommon for him to buy marijuana. While they dated, he did not have a regular source of income.

When she arrived at Jordan's house that night, he looked like "a deer in the headlights." She remembered that Jordan was quiet but just thought he had a bad day. Hadley said she saw news reports about the shooting, but when she mentioned them, she did not see Jordan react. Jordan did not tell her he was robbed earlier that day.

**Testimony of Jeremy Thomas**

Jeremy Thomas ("Thomas") is an investigator with the Montgomery County District Attorney's Office in the Digital Forensic Unit. He is certified in Cellebrite

software used to extract cell phone data. Thomas testified that he is familiar with GrayKey and has used it. Thomas described the information contained in the report prepared from Jordan's cell phone data. Thomas discussed an exhibit that included aerial maps and GPS data points pulled from Jordan's phone with times and his locations throughout the day. Thomas testified to the following timeline, including reading certain messages into the record, which was based on information pulled from Jordan's phone pursuant to a search warrant:

- 2:52 p.m. – Jordan starts a SnapChat conversation with Rash regarding how much weed and the price Rash quoted;

- 2:55 p.m. – Jordan's conversation occurred while he was at his house and ends at this time;

- 3:06 p.m. – Jordan starts searching on his phone for how far away you can hear a handgun;

- 3:31 p.m. – Jordan resumes his SnapChat conversation with Rash as read into the record by Thomas;

- 4:46 p.m. – Jordan and Rash message about when they were leaving to meet up, and Jordan was still in his neighborhood despite telling Rash he was leaving at 4:29 p.m.;

- 4:56 p.m. – Jordan receives a text message from his mom asking if he has his stepdad's truck and where he is;

- 5:13 p.m. – Jordan is at the Whistle Stop;

- 5:18 p.m. – Jordan's phone was still near the Whistle Stop;

- 5:21 p.m. – Jordan's phone was north of the Whistle Stop strip center, which was consistent with the direction of his home in Willis;

27

- 5:35 p.m. – Jordan's phone was back at his residence; and

- 9:55 p.m. – there was a Google search on Jordan's phone for a shooting in Conroe, Texas while Jordan was at his house.

**Testimony of Eric Devlin**

Eric Devlin ("Devlin") testified for the defense and is the Managing Director of Lone Star Forensic Group, a digital forensics company. Devlin testified he reviewed reports and extractions for Jordan's, Rash's, Smith's, Boyd's, and York's phones. Devlin did not examine the devices himself, instead he verified the integrity of the extractions he received and worked with those.

Devlin said that when he reviewed York's phone, he discovered evidence of marijuana sales. Devlin disputed that Rash only sold marijuana based on the cell phone information, although he denied seeing evidence that Rash sold methamphetamine, crack, PCP, fentanyl, or heroin. He also disagreed that Rash had a limited customer base of family and friends and testified it "appeared to be a larger market" that "was ongoing." Finally, Devlin testified that phone evidence showed Rash planned to buy several thousand dollars' worth of marijuana wax after his deal with Jordan that same day. Devlin testified that the $3,600 found at the scene aligned with this planned purchase.

**Testimony of Forensic Psychologist Wendy Elliott**

Dr. Wendy Elliott ("Elliott") is a forensic psychologist who testified about cognitive brain development, a recognized field within psychology. Elliott testified that a young, male brain is different from a thirty-year-old brain. Elliott explained that the prefrontal cortex responsible for decision-making is well developed by age sixteen or seventeen, but its connection to the rest of the brain is not. She described it as having "a brain that has a really, really strong accelerator and not a great brake until early to mid-20's" when "the brain really has solidified its connections and all of those parts of the brain are working together in concert and we see an improvement in decision-making." Elliott did not evaluate Jordan and said her testimony was about average males that age who are legally adults but still developing cognitively. The only information she had specific to Jordan was his age and that he was charged with capital murder. She testified that research shows adolescents and young adults make poorer decisions in the presence of peers than adults.

**Testimony of Angel Baird**

Angel Baird, a friend of Jordan's mother, testified that she has known Jordan for four or five years. She testified she had a good opinion of him, and he had a good reputation in the community as being law-abiding. Yet, she knew Jordan was

previously arrested for marijuana and learned he was illegally carrying a firearm when this happened.

**Other Evidence**

Jordan stipulated that DNA tests identified Rash's blood on the pants he wore that evening. That stipulation was read into the record for the jury, and a copy was admitted into evidence. Additional evidence at trial included, among other things: photographs of the scene and victims; autopsy x-rays; copies of SnapChat messages between Jordan and Rash; a cell phone report from the download of Jordan's phone; surveillance video from businesses in the strip center where the shooting happened; Tosto's bodycam video from the Whistle Stop scene; Rash's and York's autopsy reports; text messages between Jordan and Hadley; maps with marked GPS location data pulled from Jordan's phone; photographs of the white Ford F-250; bond paperwork for Jordan's prior marijuana offense with his stepfather's contact information; and a video of Jordan's police interview.

## ANALYSIS

### Issues One and Two: Sufficiency of the Evidence

In issues one and two, Jordan complains the evidence was insufficient to support the jury's guilty verdict and that the trial court erred in denying his motion for directed verdict. Specifically, he complains that no evidence was introduced to show he intended to cause the death of York and Rash. We address these issues

30

together since we treat a complaint about the denial of a motion for directed verdict "as a challenge to the legal sufficiency of the evidence." *See Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996) (citation omitted); *Andrus v. State*, 495 S.W.3d 300, 304 (Tex. App.—Beaumont 2016, no pet.) (citation omitted).

In evaluating legal sufficiency of the evidence to prove the charged offense, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Under the *Jackson* standard, we defer to the jury's responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *See Hooper*, 214 S.W.3d at 13. The jury as factfinder is the sole judge of the weight of the evidence and witnesses' credibility, and it may believe all, some, or none of the testimony presented by the parties. *Metcalf*, 597 S.W.3d at 855 (citations omitted). We do not reweigh the evidence or determine the credibility of the evidence, nor do we substitute our judgment for the factfinder's. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of

31

all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted).

A person commits capital murder if he "intentionally or knowingly causes the death of an individual[]" and "murders more than one person . . . during the same criminal transaction[.]" Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(7)(A). The indictment alleged that Jordan "intentionally or knowingly cause[d] the death of . . . Devin Rash, by [s]hooting Devin Rash with a firearm, and during the same criminal transaction, did then and there intentionally or knowingly cause the death of . . . Ryan York, by [s]hooting Ryan York with a firearm[.]" The court charged the jury on capital murder and the lesser-included offense of murder. *See id.* The court also charged the jury on self-defense as justification for the offense. Finally, the court instructed the jury that they could find Jordan was justified in using deadly force to defend himself: (1) against both complainants, which would result in a "not guilty" verdict; (2) one complainant but not the other, which would mean a guilty verdict for the lesser-included offense of murder; or (3) against neither complainant, which would result in a guilty verdict for capital murder.

Texas recognizes the defense of justification, which excludes criminal responsibility for otherwise criminal behavior. *See id.* § 9.02. Self-defense is one type of justification. *See id.* § 9.31. "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is

32

immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a).

> [A] defendant bears the burden of production, which requires the production of some evidence that supports the particular defense. Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the raised defense. The burden of persuasion is not one that requires the production of evidence, rather it requires only that the State prove its case beyond a reasonable doubt. When a jury finds the defendant guilty, there is an implicit finding against the defensive theory.

*Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991)); *see also Valverde v. State*, 490 S.W.3d 526, 527–28 (Tex. App.—San Antonio 2016, pet. ref'd). In reviewing a challenge to the sufficiency of the evidence to support the jury's implicit rejection of self-defense,

> we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Saxton*, 804 S.W.2d at 914 (citations omitted). Self-defense is a fact issue the jury determines, and it is free to accept or reject any defensive evidence on the issue. *See id.* at 913–14. Defensive evidence consistent with the scene's physical evidence will not render the State's evidence insufficient since evidentiary credibility determinations are solely within the jury's province, and the jury is free

33

to accept or reject the defensive evidence. *See Montemayor v. State*, 55 S.W.3d 78, 82 (Tex. App.—Austin 2001, pet ref'd). A jury's finding of guilt constitutes an implicit finding that it rejected the defensive theory. *See id.*; *see also Valverde*, 490 S.W.3d at 528.

Jordan did not dispute that he killed Rash and York, rather the issue is whether he was justified in doing so. The evidence supporting the claim of self-defense was based on what Jordan told detectives during his interview as recounted by Mitchell's testimony and the video confession–that they cursed at him, York grabbed him, and they tried to rob him.

The jury heard and saw other evidence that contradicted Jordan's claims. Mitchell testified that shooting York first in the right side of his head was inconsistent with Jordan's actively struggling with York. Mitchell also said that based on his experience, Jordan's searching a car for marijuana after shooting three people was inconsistent with a self-defense claim. The jury heard witnesses testify that Rash was still in his seatbelt when they found him dead at the scene and $380 was found in Jordan's pants. Smith also told the jury they had no plans to rob Jordan. Jordan told detectives he did not see a weapon, and police did not find any weapons in the car. The jury was free to disbelieve Jordan's version of events and reject his justification of self-defense. *See Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913–14; *Valverde*, 490 S.W.3d at 528; *Montemayor*, 55 S.W.3d at 82.

34

We turn to Jordan's argument that there was no evidence introduced at trial that he intended to kill York and Rash. A firearm is statutorily defined as a deadly weapon. Tex. Penal Code Ann. § 1.07(17)(A). A jury can infer the intent to kill when a deadly weapon is used unless it would be unreasonable to infer that death or serious bodily injury could result from using the weapon. *Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012); *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). The most obvious and easiest cases to prove intent to kill, are those in which a firearm was used and fired at a person. *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986). Jordan used a firearm when he fired at York and Rash, shooting them both in the head, thus the jury was free to infer the requisite intent to kill. *See Cavazos*, 382 S.W.3d at 384; *Jones*, 944 S.W.2d at 647; *Godsey*, 719 S.W.2d at 581. A jury may consider events that occurred before, during, and after the commission of the offense. *Pitonyak v. State*, 253 S.W.3d 834, 844 (Tex. App.—Austin 2008, pet. ref'd). These events included Jordan's internet search a few hours before the murders for how far away you can hear a handgun and him searching a car for marijuana after killing two people and seriously injuring another by shooting them in the head with a firearm.

Viewing all the evidence in the light most favorable to the prosecution, we hold that a rational jury could have found that Jordan intentionally or knowingly killed Rash and York in a single transaction beyond a reasonable doubt. *See Jackson*,

35

443 U.S. at 318–19; *Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13; *see also* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(7)(A)(1). We also hold a rational jury could have found against Jordan on his self-defense claim beyond a reasonable doubt. *See Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913–14; *Valverde*, 490 S.W.3d at 527–28. Thus, the evidence was legally sufficient to support the jury's guilty verdict for the offense of capital murder as charged in the indictment. We overrule issues one and two.

### Issues Three, Four, Five, and Eight: Evidentiary Rulings

In issues three, four, five, and eight, Jordan challenges the trial court's evidentiary rulings.

### Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion and must uphold the trial court's ruling if it was "within the zone of reasonable disagreement." *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020) (citation omitted). A trial court abuses its discretion if it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). We uphold the trial court's decision if correct on any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009); *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002). If the trial court erred in admitting or excluding evidence,

then we generally apply the harm standard in Texas Rule of Appellate Procedure 44.2(b), which requires us to disregard errors that do not affect substantial rights. *See* Tex. R. App. P. 44.2(b); *see also Walters v. State*, 247 S.W.3d 204, 218–19 (Tex. Crim. App. 2007) (citation omitted).

**Admission of 9-1-1 Call**

In issue three, Jordan complains the trial court erred by admitting Boyd's 9-1-1 call over his objection that it violated his right to confrontation. In support of this issue, Jordan contends Boyd was not the victim. The State counters that the 9-1-1 recording was admissible as a nontestimonial statement under *Davis v. Washington*, 547 U.S. 813, 822 (2006).

The Sixth Amendment's Confrontation Clause affords an accused the right to confront witnesses in criminal prosecutions. U.S. CONST. amend. VI. The Confrontation Clause prohibits admitting testimonial hearsay statements unless the prosecution can demonstrate that the out-of-court declarant is unavailable to testify, and the defendant has had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 59 (2004); *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). Whether a statement is testimonial or non-testimonial is a question of law that we review de novo. *See De La Paz*, 273 S.W.3d at 680; *Cook v. State*, 199 S.W.3d 495, 497 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (stating that we review de novo trial court's ruling that admission of 911

tape did not violate rights under Confrontation Clause); *see also Paulette v. State*, No. 09-20-00027-CR, 2022 WL 107160, at \*12 (Tex. App.—Beaumont Jan. 12, 2022, pet. ref'd) (mem. op., not designated for publication).

We focus on the objective purpose of the interview or interrogation, not the declarant's expectations, when determining whether a hearsay statement is "testimonial." *See De La Paz*, 273 S.W.3d at 680 (quoting *Davis*, 547 U.S. at 822–23) (other citation omitted). *In Davis v. Washington*, the Supreme Court explained:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822; *see also De La Paz*, 273 S.W.3d at 680 (citation omitted). Consistent with this, "[s]tatements made to police during contact initiated by a witness at the beginning of an investigation are generally not considered testimonial." *Cook*, 199 S.W.3d at 498 (citation omitted). Usually, 911 calls initiated to summon police assistance are "nontestimonial because they are 'a cry for help' or 'the provision of information enabling officers immediately to end a threatening situation.'" *Guzman v. State*, No. 02-18-00332-CR, 2019 WL 2223213, at \*2 (Tex. App.—Fort Worth May 23, 2019, no pet.) (mem. op., not designated for publication) (quoting *Davis*, 547 U.S. at 832) (other citations omitted).

We consider the following non-exhaustive list of factors when determining whether statements were made during an ongoing emergency:

> 1) whether the situation was still in progress; 2) whether the questions sought to determine what is presently happening as opposed to what has happened in the past; 3) whether the primary purpose of the interrogation was to render aid rather than to memorialize a possible crime; 4) whether the questioning was conducted in a separate room, away from the alleged attacker; and 5) whether the events were deliberately recounted in a step-by-step fashion.

*Vinson v. State*, 252 S.W.3d 336, 339 (Tex. Crim. App. 2008) (citations omitted). Once a defendant objects to a statement as violating the Confrontation Clause, the burden shifts to the State to establish the statement (1) did not contain testimonial hearsay, or (2) contained testimonial hearsay but was nevertheless admissible under *Crawford*. *De La Paz*, 273 S.W.3d at 680–81. At trial, the State argued the 9-1-1 call was nontestimonial.

The record shows that Boyd called 9-1-1 on February 12, 2020, and the call lasted a little over eleven minutes. During the call, Boyd spoke with the 9-1-1 operator and EMS personnel and reported the location of the emergency. Boyd stated that "two people, I think three have been shot," and "my friend just called me, he's there with my boyfriend and another friend, and he said he didn't know what to do." She explained her friend "was panicking," so she told him that she would call 9-1-1. Boyd told the operator that "someone got in his car and shot them," and her friends were in "a black Nissan." When the operator asked for a phone number for her

39

boyfriend, Boyd answered that "he's not responding apparently, so he's not going to answer." Boyd sounded distressed, was crying, and breathing heavily. Boyd explained that she was on her way to the location. Boyd tearfully asks, "Can you just please send somebody, please?"

Once the 9-1-1 operator patched EMS into the call, Boyd repeated to EMS that her friends had been shot, and two were unresponsive. EMS told Boyd to "take a deep breath" and assured her "help is on the way." When she told EMS she was "about to pull into the parking lot[,]" EMS instructed, "I don't want you to pull into the parking lot. I don't want you to put yourself in any danger." EMS asked the location of the injuries and if she knew where the assailant went, but Boyd did not know. EMS advised, "The paramedics are coming to you as fast as they safely can with their lights and sirens."

Boyd advised the operator where she was parked and that she saw the police arrive. The operator is heard repeatedly telling Boyd to stay away from the scene, while Boyd is heard crying. The operator also asked if Boyd knew who the men were meeting, but she did not. Boyd asked, "When are the ambulances supposed to be here? They're not here yet." The operator advised, "They are responding as fast as they can safely[,]" and "we have as many people coming to help as we can." The operator instructed Boyd not to call family members since officers needed to secure the scene.

To determine whether these statements were made under circumstances objectively indicating the primary purpose was to enable police to meet an ongoing emergency, we apply the non-exclusive factors set forth in *Davis* and *Vinson*. *See Davis*, 547 U.S. at 826–28; *Vinson*, 252 S.W.3d at 339. As to the first factor, when Boyd called, the situation was unfolding, police had not secured the scene, and EMS had not arrived. She relayed the information Smith provided, which was that all three were shot, he was bleeding, and the other two were unresponsive, but she did not know the extent of the injuries. Further reflecting the situation was ongoing, EMS told her not to put herself in danger, which indicated they did not know if the shooter was still at the scene. As for the second and third factors, although the operator and EMS inquired about how the incident happened, they sought to determine the current condition of the individuals and how many there were to effectively render aid. They repeatedly assured Boyd help was coming as fast as safely possible with "lights and sirens." As to the fourth factor, Boyd made the call, the interaction occurred entirely over the phone, and there was no questioning in a "separate room." Finally, regarding the fifth factor, the events were not recounted in a step-by-step fashion. Boyd frantically pleaded for help throughout the call and provided what information she had when asked.

Applying the non-exclusive factors above and viewing the evidence objectively, we conclude that Boyd's statements in the 9-1-1 call were made "under

41

circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *See Davis*, 547 U.S. at 822, 826–28; *Vinson*, 252 S.W.3d at 339. Thus, we hold the 9-1-1 call was nontestimonial in nature, and the trial court did not err by admitting it. *See Davis*, 547 U.S. at 822, 826–28; *Vinson*, 252 S.W.3d at 339.

We note that Jordan argues that Boyd was not a victim and attempts to distinguish it from other cases that concluded statements were nontestimonial in nature and cites *Gutierrez v. State*, 516 S.W.3d 593 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). Yet, in *Gutierrez*, the court's analysis did not depend on whether a victim made the statements, instead the court focused on "whether the primary, objective purpose of the call and the statements were to report an ongoing emergency." *Id.* at 598 (citations omitted). The determining factor was that the statements "were concerned with the details of the offense, not an ongoing emergency." *Id.* at 599. We are unaware of any authority holding that a determination of a statement's testimonial nature depends on the reporter's victim status nor does Jordan cite any. We can think of many times when non-victims call 9-1-1 seeking aid for ongoing emergencies, including when victims are unconscious or unable. To render those statements testimonial based on victim status alone would have far-reaching ramifications that contradict established precedent which focuses objectively on the call's primary purpose of seeking to render aid in an ongoing

42

emergency. *See Davis*, 547 U.S. at 822, 826–27; *Vinson*, 252 S.W.3d at 339. We overrule issue three.

**Admission of Bodycam Footage and Photographs**

In issues four and five, Jordan complains about the trial court's admission of Tosto's bodycam footage of the scene and victims, a still photo of Smith talking to EMS with blood on his head taken from bodycam footage, and photographs taken by the medical examiner's office of Rash's and York's bodies lying on the ground with blood on their clothes and heads. For each complained-of exhibit, Jordan objected under Rule 403 that the prejudicial impact outweighed the probative value. *See* Tex. R. Evid. 403.

Evidence having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence is relevant. *See id.* 401. Rule 403 permits a trial court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." *Id.* 403. Rule 403 favors admitting relevant evidence and "carries a presumption that relevant evidence will be more probative than prejudicial." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) (citation omitted).

43

Admissibility of photographs is within the trial court's sound discretion. *Rayford v. State*, 125 S.W.3d 521, 529 (Tex. Crim. App. 2003). If the trial court's ruling falls within the zone of reasonable disagreement, it does not abuse its discretion. *De La Paz*, 279 S.W.3d at 343–44. In determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, we consider: the number of exhibits offered; their gruesomeness; their detail; their size; whether they are in color; whether they are close up; whether the body depicted is clothed; the availability of other means of proof; and other circumstances unique to the individual case. *See Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002). A trial court does not err merely because it admits gruesome photographs. *See Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995). Photographs are "powerful visual evidence, probative of various aspects" of the offense "including the brutality and heinousness of the offense." *Id*.

The bodycam was highly probative as it showed Tosto arriving on scene and locating the vehicle, the victim's location in the car, the victims' head wounds, Rash still wearing a seatbelt, and life-saving measures. The two colored photographs of Rash's and York's clothed bodies at the scene taken by the medical examiner's office were probative to show the injuries and clothes they were wearing. The photographs may be "somewhat gruesome, but these results were apparently what appellant himself intended[]" when he shot three men in the head. *See Kendrick v. State*, 942

S.W.2d 120, 126 (Tex. App.—Beaumont 1997, no pet.) (noting same in context of photographs depicting victims' charred remains). The same is true for the still photograph of Smith speaking to EMS with a significant head injury, especially considering the defense's challenge to his credibility on cross-examination based on gaps in his memory.

The trial court was within the zone of reasonable disagreement when it determined the complained-of evidence's probative value was not outweighed by unfair prejudice to Jordan. *See* Tex. R. Evid. 403; *Sonnier*, 913 S.W.2d at 519; *Kendrick*, 942 S.W.2d at 126. We overrule issues four and five.

**Admission of Mitchell's Opinion Testimony on Jordan's Truthfulness**

In issue eight, Jordan challenges the trial court's admission of Detective Mitchell's opinion testimony that Jordan was untruthful. Jordan complains that the State improperly asked whether Mitchell believed Rash, York, and Smith tried to rob Jordan, and about Mitchell's response that he did not believe that. Jordan objected at trial that Mitchell was not in the position to give an opinion because he was not in the car at the time and did not have personal knowledge. Mitchell argues on appeal that Mitchell's "answer was the functional equivalent of him providing prohibited opinion testimony of 'truthfulness.'"

To preserve a complaint for appellate review, a party must timely object to the evidence with enough specificity to let the trial court know what he wants and

45

why. *See* Tex. R. App. P. 33.1(a). Generally, a party must continue to object each time inadmissible evidence is offered. *See Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003) (quoting *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991)). The exceptions to this are when a party obtains a running objection, or the court hears the objection outside the jury's presence. *See id.*

The record shows that Mitchell provided similar opinion testimony about Jordan's truthfulness elsewhere without objection. While playing Jordan's interview for the jury, Mitchell was asked on at least eight other occasions whether he believed Jordan was being honest during the interview, and he testified every time he did not believe Jordan was honest. Each of these questions asked Mitchell to provide an opinion about whether Jordan was being truthful, which Mitchell did. We hold that Jordan forfeited his complaint by failing to renew his objection each time Mitchell testified about Jordan's truthfulness, to obtain a running objection, or request a hearing outside the jury's presence. *See* Tex. R. App. P. 33.1(a); *Martinez*, 98 S.W.3d at 193 (quoting *Ethington*, 819 S.W.2d at 858). We overrule issue eight.

### Issues Six and Seven: Motions to Suppress

In issues six and seven, Jordan complains the trial court erroneously denied his motions to suppress. In issue six, Jordan contends the trial court erred when it overruled his Motion to Suppress Arrest and Evidence, asserting that he was arrested

without a warrant or probable cause. In issue seven he argues the trial court erred in not suppressing his custodial statements at the Conroe Police Department.

**Motions to Suppress and Pretrial Suppression Hearing**

Before trial, Jordan filed two motions to suppress: (1) Motion to Suppress Arrest; and (2) Motion for Hearing on Admissibility of Statement by Defendant addressing what took place at the police station. The parties' central dispute was whether Jordan was arrested at McDonald's or whether the interaction constituted an investigative detention. Jordan argued that this was a non-consensual encounter, and he was arrested without probable cause. The State argued that it was an investigative detention supported by reasonable suspicion. During the suppression hearing, the parties focused on the motion to suppress the arrest rather than the custodial statement. Defense counsel argued Jordan did not feel like he was free to leave but noted that once Jordan arrived at the station,

> [I]t appears that the rights were read to him correctly, and it appears that he waived them, but since this is the step before that, we think that's the one you should focus on. We think they have not been able to carry their burden to show this was a valid consent to be interviewed. So, we ask you to grant our motion to suppress arrest.

The following exchange occurred at the end of the suppression hearing:

> THE COURT: Both sides are dealing with the motion to suppress the arrest, correct?
>
> [THE STATE]: Your Honor, I think that was my argument. I think the evidence was clear from the stand about the statement and how it was conducted, and I think it speaks for itself as to the motion to suppress the defendant's statement.

47

[THE DEFENSE]: And I didn't address it in argument because I think the stronger argument is the argument to suppress the arrest. However, I will just point out that the detective said he did nothing to determine whether he was intoxicated or not, and he acknowledged he had no idea whether he was. So, it's there for your consideration.

[THE COURT]: That's what I'm asking.

The trial court signed an Order denying the Motion to Suppress Arrest but did not sign the proposed custodial statement.

Detective Mitchell testified at the suppression hearing. He testified his partner called him on February 12, 2020, around 5:30 p.m. and told him about a shooting at the Whistle Stop. He explained it was originally reported by a 9-1-1 caller, Frankie Boyd. He testified that Boyd reported that her friend Smith, who was with her boyfriend, Rash, and York, called and told her someone got into his car, shot multiple times, and Rash and York were "nonresponsive." According to Boyd, Smith was also shot, and they were in a black Nissan.

Mitchell testified that Officer Tosto responded to the priority dispatch and found the black Nissan. Mitchell said he reviewed Tosto's bodycam footage, which was admitted into evidence at the suppression hearing. Mitchell described the footage and explained that as Tosto approached the Nissan, "he discovered Bryce [Smith], who was bleeding from the face. Then, he finds the other two victims that had been shot, both unresponsive. Devin Rash is sitting in the front, right, passenger seat, and Ryan York sitting in the back, left, passenger seat behind the driver seat."

Smith was shot in the head and able to speak, although he was not fully coherent and unable to initially give a good description about who did it. There was nobody in the right, rear vehicle seat. Mitchell said the video showed Rash's cell phone.

Mitchell testified that another Conroe police officer interviewed Smith at the hospital, which was recorded by bodycam that Mitchell watched. At the hospital, Smith provided more information and described the suspect as a white male with a "white, jacked up . . . Ford F-150 with dark, tinted windows." Smith explained they were at the Whistle Stop to sell marijuana to this person, and at 6:00 p.m., the officer radioed the information to detectives working the scene.

Mitchell said that Boyd, who identified herself as Rash's girlfriend, arrived at the Whistle Stop, and another detective interviewed her. She told officers the three men left together around 5 p.m. in Smith's black Nissan, and Rash, who sold marijuana, was carrying a bag. Boyd told the detective that Rash set up deals using SnapChat, described his phone, and gave detectives Rash's phone passcode. Once Mitchell had this lead, he wanted to look at Rash's SnapChat. Mitchell testified that crime scene units began collecting and processing evidence, including Rash's cell phone. The phone they collected matched the description Boyd provided and opened with the passcode.

Mitchell explained that they reviewed SnapChat messages on Rash's phone and took photos of them at 7:17 p.m. Those messages showed that someone

49

identified as "Nick Jordan" with a SnapChat username "nickjordan00" messaged Rash about buying two ounces of marijuana. Photographs of the SnapChat messages were admitted into evidence during the hearing. Mitchell said the messages showed they agreed to a price of $380 and to meet at the Whistle Stop. Rash told Jordan to park "by the semi in the end of the parking lot[.]" Rash said he would be in a black Nissan, which they found next to the semi-trailer. Jordan described his vehicle as a "jacked up, white Ford[,]" consistent with what Smith reported at the hospital. Mitchell testified that when he read these messages, he was suspicious of Nick Jordan in a white, Ford truck, and said, "I believe he was the last person that possibly had contact with the victims." He also believed the "00" at the end of "nickjordan" might refer to a birth date.

Mitchell explained that another detective was provided a description of the suspect and vehicle and checked businesses nearby, including Makeup Junkie, for surveillance video. A surveillance image captured by Makeup Junkie at 5:19 p.m. was admitted into evidence and showed a lifted, white Ford truck matching that description. He reviewed surveillance footage and saw no other vehicles matching the description. Mitchell testified the information about the white Ford was relayed to the entire investigative team.

Mitchell testified they provided the Snapchat username of "nickjordan00" and detailed truck description to analysts with the Real Time Crime Center, who cross

reference law enforcement databases and produce leads. When they cross-referenced that information, the only "Nick Jordan" they found in the area was "Waymon Nicholas Jordan." Mitchell testified Real Time Crime Center provided investigators bond paperwork for "Waymon Nicholas Jordan" with a birth year of 2000, for possession of marijuana. The bond paperwork was admitted into evidence and included a contact name for Gerald Williams, which was Jordan's stepfather. Mitchell explained that Williams owned a lifted, white, Ford truck, and license plate reader hits from his registered plate matched the described vehicle. Real Time provided them with an alternate address on Canyon Hills associated with Williams and Jordan. Plainclothes, undercover detectives were dispatched to that address and reported "a white, Ford F-250, brush guard, dark tinted windows, black wheels matching the description parked in the driveway."

Mitchell testified that once they received information about the truck connected to Jordan with birth year 2000, officers continued watching the house and vehicle, but around 10:38 p.m., other team members moved to a Kroger on 1097 in Willis. Officers watching the Canyon Hills address relayed that a white male and female left the residence, and the young white male roughly matched the description they had. Mitchell testified the officers followed the vehicle to the McDonald's on FM 1097, across the street from the Kroger where officers relocated. When the vehicle stopped in the drive-thru, Lieutenant Stowe approached it to identify the

51

individuals inside, and when this transpired, about five hours had passed since the shooting.

Bodycam video was admitted into evidence showing Stowe calmly approaching the vehicle in the drive-thru and identifying himself, and Stowe did not have a weapon. The passenger identified himself as Nick Jordan, which Mitchell believed fit the Whistle Stop meeting and SnapChat conversation. Mitchell was suspicious of Jordan at that point and believed he was involved in the crime. After Jordan identified himself to Stowe, Detective Adams approached and told him they were investigating a murder, his name came up, and they wanted him to speak with him at the station. Jordan declined and said he wanted to go home. Mitchell then approached Jordan, identified himself, and explained it would "behoove him to aid us in the investigation," but they could not do that in the parking lot. Mitchell testified the Conroe Police Station was about ten minutes away, and after telling Jordan it was a better place to talk, Jordan again declined before eventually telling officers he would come with them since "I don't have a choice."

Mitchell testified that when he arrived at the McDonald's, he had the following information: (1) Snapchat messages describing the marijuana transaction; (2) confirmation that the vehicle captured on Makeup Junkie surveillance at the scene at the time of the murders was the same truck located at the Canyon Hills address (based on plate read and bond paperwork); (3) the bond paperwork for a

52

marijuana offense showing someone named Waymon Nicholas Jordan with a birth year of 2000 that corresponded to the "00" in the Snapchat handle "nickjordan00"; and (4) a witness described the person as a white male.

Officers put Jordan into a car without handcuffs and transported him to the Conroe Police Department. During the transport, the officer did not question Jordan. When they arrived at the police station, they immediately put Jordan in an interview room and Mirandized him before questioning him. Mitchell said that Jordan acknowledged he understood his rights and voluntarily waived them before giving a statement. Mitchell testified that he and Adams confirmed Jordan understood his Miranda rights.

Mitchell testified that Jordan's evasive answers made the interview last longer, and Jordan confessed to murdering Rash and York and shooting Smith two hours and forty-three minutes into the interview. After Jordan confessed, they arrested him. Officers did not try to determine whether he was intoxicated before speaking with him.

In urging the motions to suppress, Jordan argued that he did not think he was free to leave. He also asserted the totality of the circumstances showed that he did not want to be interviewed. Jordan focused on the fact that he did not feel as if he had a choice. The defense also acknowledged that once he arrived, it appeared his rights were read correctly, and he waived them. Yet, he argued that "since this is the

step before that, we think that's the one you should focus on. We think they have not been able to carry their burden to show this was a valid consent to be interviewed. So, we ask you to grant our motion to suppress his arrest."

The State argued the encounter was an investigative detention and fell "in the middle" of a consensual encounter and a full-blown arrest. The State argued this must be judged from the perspective of a reasonable officer at the scene rather than in hindsight. The State argued that "if a police officer can articulate specific facts giving rise to the belief that this person has been or will be involved in a crime, that gives them the suspicion that they need to detain that individual" to investigate. The State then identified specific, articulable facts officers had when they transported Jordan to the police station. The State also argued that officers are allowed to use reasonably necessary force to maintain the status quo during an investigation. The trial court denied Jordan's Motion to Suppress Arrest. The record did not initially contain Findings of Fact and Conclusions of Law, so we abated the appeal and requested the trial court provide them. The trial court did not sign the order regarding the custodial statement.

Exhibits admitted at the suppression hearing included bodycam video at the McDonald's and bodycam from the officer who transported him to the station, photographs of the truck, SnapChat messages from Rash's phone with nickjordan00, and copies of the Jordan's bond paperwork listing Williams as a contact. The video

54

of the interview at the police station was not offered as an exhibit, but Mitchell testified about what transpired.

## Findings of Fact and Conclusions of Law

The trial court supplemented the record with Findings of Fact and Conclusions of Law, which included the following, among others:

FINDINGS OF FACT

. . .

15. During the entire interaction at McDonald's, there were no lights and sirens, no weapons drawn, no taser pointed, and no force used on the defendant.

16. The officers who had been staging at the Kroger diverted to the McDonald's, but most of them stood around the perimeter of the parking lot and were not involved with speaking to the defendant.

. . .

18. Everyone who interacted with the defendant on scene maintained a calm and requesting tone and demeanor.

19. The defendant appeared calm as well.

20. He did not seem nervous, frightened, or intimidated.

21. Detective Adams informed the defendant that his name came up in an investigation and asked him to accompany Adams to the police station to speak.

22. The defendant said he would rather just go home.

23. Mitchell re-approached the defendant and explained that they needed to speak with him at the police department about something serious, and could not continue to speak in the McDonald's parking lot.

24. The defendant said alright, and agreed to go with him.

25. Mitchell explained that another officer would give the defendant a ride, and the defendant said "if I don't have a choice."

26. the defendant was transported in a patrol car, but he was never told he was under arrest and he was not handcuffed at any point while at the McDonald's or during the ride to the police station.

. . .

32. At the conclusion of the hearing, the defendant argued that the State had not carried its "burden to show this was a valid consent to be interviewed."

33. The defendant conceded at the hearing that his rights were read to him correctly, and that he waived them.

34. The defendant did not argue or present any evidence that his statement was involuntary, aside from arguing that Mitchell did not affirmatively inquire about whether the defendant was intoxicated.

35. The defendant instead focused his argument at the hearing on the motion to suppress his arrest.

36. The recorded interview was admitted at trial as exhibit 93.

37. The video begins with the defendant being shown in the interview room, where he sat down.

38. Over six minutes later, Detectives Mitchell and Adams entered and sat down.

39. They asked for the defendant's name, address, and date of birth. The defendant understood and appropriately answered the questions.

40. Mitchell stated that he appreciated the defendant coming to talk to them, but said he needed to read the defendant his rights before they spoke.

41. The defendant acknowledged his understanding, stating "yeah, go ahead."

42. Mitchell read the defendant his statutory rights, and asked the defendant if he understood those rights.

43. The defendant immediately and unequivocally replied, "yes, sir."

44. Adams asked "do you know what all that means?"

. . .

46. The defendant understood his rights and voluntarily waived those rights and gave a statement.

. . .

49. The defendant understood that he did not have to accede to the detectives' requests.

50. The defendant voluntarily continued answering the detectives' questions.

51. The defendant seemed to understand the detectives' questions and answered them coherently.

52. Throughout the interview, the defendant appeared to be in total control of his mental faculties.

53. The defendant did not request an attorney at any point.

54. Despite being advised that he had the right to terminate the interview at any time, the defendant never chose to do that.

. . .

56. There were no indications that the defendant was intoxicated, impaired, or mentally unsound.

. . .

65. Though Mitchell said it would "behoove" the defendant to speak with the detectives, and made several statements indicating that he wanted to "help" the defendant, neither detective promised the defendant any benefit if he confessed.

66. The detectives never threatened or coerced the defendant.

67. Mitchell truthfully told the defendant that the information they had made it look like the defendant committed capital murder. That statement was accurate, and not a threat likely to induce a false confession.

68. The defendant lied to the detectives for over two hours, which contributed to the length of the interview as the detectives tried to investigate his claims.

69. About two hours and forty-three minutes into the interview, the defendant admitted that he shot the three victims, claiming he did so after being attacked.

70. No evidence suggested the defendant was intoxicated or impaired by any substance while being interviewed, or that he lacked the mental capacity to understand and voluntarily waive his rights.

71. No evidence showed that police coerced the defendant to confess, or that his confession resulted from police overreaching or misconduct.

72. The defendant's decision to waive his rights and give a statement was voluntary.

73. The defendant's confession was voluntary.

CONCLUSIONS OF LAW

1. The defendant was read the requisite statutory and constitutional warnings at the beginning of his video-recorded interview, and the totality of the circumstances show that he understood those warnings and knowingly, intelligently, and voluntarily waived his rights. *See* Tex. Code Crim. Proc. Ann. art. 38.22 § 3, 7; *Joseph v. State,* 309 S.W.3d 20, 24-27 (Tex. Crim. App. 2010); *see also Ortiz v. State,* No. 08-23-00025-CR, 2024 WL 2178996, at *5 (Tex. App.—El Paso May

57

15, 2024, no pet. h.) (mem. op., not designated for publication) (collecting cases).

2. The defendant did not raise any disputed fact issue concerning the legality of obtaining his statement. *See Oursbourn v. State,* 259 S.W.3d 159, 181-82 (Tex. Crim. App. 2008).

3. The defendant's confession did not result from police coercion or overreaching. *See id.* at 169-71; *see also Ortiz,* 2024 WL 2178996, at *5-8) (interrogation not coercive where defendant given food, water, and breaks; police promised no specific benefit; and no evidence showed defendant to be intoxicated or impaired); *Fineran v. State,* 201 S.W.3d 361, 365-66 (Tex. App.—El Paso 2006, pet. ref'd) (similar).

4. The defendant's confession was voluntary. *See* Tex. Code Crim. Proc. Ann. art. 38.22 § 6; *Lopez v. State,* 610 S.W.3d 487, 496-98 (Tex. Crim. App. 2020); *Cameron v. State,* 630 S.W.3d 579, 596 (Tex. App.—San Antonio 2021, no pet.) (defendant's statement voluntary where defendant appeared to understand and coherently answer each question and no evidence was presented to show she was susceptible to psychological pressures); *Giddens v. State,* 256 S.W.3d 426, 430-31 (Tex. App.—Waco 2008, pet. ref'd) (defendant's confession voluntary and not product of coercive interrogation where length of interview due largely to defendant's deception; defendant was offered breaks and refreshment; and no evidence showed defendant unwilling to talk).

## Standard of Review and Applicable Law

We review a trial court's denial of a motion to suppress under a bifurcated standard. *See Igboji v. State*, 666 S.W.3d 607, 612 (Tex. Crim. App. 2023); *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007) (stating same in determination of reasonableness of a temporary investigative detention or arrest). We review a trial court's determination on the reasonableness of a specific search or seizure using a de novo standard. *Igboji*, 666 S.W.3d at 612; *Amador*, 221 S.W.3d at 673. We afford trial courts almost complete deference in determining historical facts that depend on credibility and demeanor. *Igboji*, 666 S.W.3d at 612; *Amador*, 221 S.W.3d at 673.

58

Where, as here, a trial court issues findings of fact and conclusions of law, we view the evidence in the light most favorable to the ruling and determine whether the evidence supports those findings. *See State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case. *See Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009).

**Officers' interaction with Jordan was a consensual encounter that moved into an investigative detention.**

The United States and Texas Constitutions prohibit unreasonable searches and seizures. U.S. CONST. amend. IV; Tex. Const. art. I, § 9. "The law recognizes three types of police-citizen interactions related to searches and seizures: (1) consensual encounters that do not implicate the Fourth Amendment; (2) investigative detentions that must be supported by a reasonable suspicion of criminal activity; and (3) arrests that are reasonable only if supported by probable cause." *Monjaras v. State*, 664 S.W.3d 921, 927 (Tex. Crim. App. 2022) (citing *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016)) (other citation omitted).

"An encounter is consensual only if the citizen is free to leave and terminate the interaction at any time." *Monjaras*, 664 S.W.3d at 927; *Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010). An interaction is a detention when a person cedes to an officer's show of authority under a reasonable belief that he is not free to leave. *See Crain*, 315 S.W.3d at 49. "There is no bright line rule dictating when a

consensual encounter becomes a detention." *Furr*, 499 S.W.3d at 877 (citation omitted); *see also Monjaras*, 664 S.W.3d at 927. "Rather, reviewing courts must 'examine the totality of the circumstances to determine whether a reasonable person would have felt free to ignore the officer's request or to terminate the consensual encounter.'" *Monjaras*, 664 S.W.3d at 927 (quoting *Furr*, 499 S.W.3d at 877; *State v. Castleberry*, 332 S.W.3d 460, 467 (Tex. Crim. App. 2011)). Whether a citizen has been detained is an objective determination, and a detainee's or law enforcement's subjective intent or belief is irrelevant. *See Stansbury v. California*, 511 U.S. 318, 323 (1994); *Monjaras*, 664 S.W.3d at 927; *Furr*, 499 S.W.3d at 878; *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).

An officer merely requesting identification and permission to search does not escalate an encounter into an investigative detention. *Hunter v. State*, 955 S.W.2d 102, 104 (Tex. Crim. App. 1997); *see also Castleberry*, 332 S.W.3d at 466 (explaining that officers may request identification and information from a citizen without reasonable suspicion). Nor does a consensual encounter become an investigative detention merely because an officer fails to inform the citizen that he does not have to comply with the requests. *Monjaras*, 664 S.W.3d at 927 (citation omitted). If the officer conveys to the citizen that compliance with the requests is required, then an investigative detention occurs. *Id.*

Whether a use of force elevates the detention to an arrest turns on the reasonableness of the intrusion under all the facts. *Bartlett v. State*, 249 S.W.3d 658, 669 (Tex. App.—Austin 2008, pet. ref'd). Factors considered in determining whether the encounter is an investigative detention or arrest include: (1) the officers' degree of force; (2) detention's duration; (3) efficiency of investigative process and location; (4) officer's expressed intent – whether he told the individual he was under arrest or detained; (5) the nature of the crime under investigation; (6) the degree of suspicion; (7) location of stop; (8) time of day; (9) the suspect's reaction; and (10) whether the officer actually investigates. *See State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008); *State v. Moore*, 25 S.W.3d 383, 386 (Tex. App.—Austin 2000, no pet.); *see also Bartlett*, 249 S.W.3d at 669. When examining the detention's duration, courts also consider whether the detainee's evasive answers increased the time required for officers to question him. *See Balentine v. State*, 71 S.W.3d 763, 771 (Tex. Crim. App. 2002) (noting the time needed to question appellant about his possible involvement "increased substantially because of *appellant's* evasive answers," and not because of officer's dilatory tactic). "'[C]ommon sense and ordinary human experience must govern over rigid criteria.'" *Rhodes v. State*, 945 S.W.2d 115, 118 (Tex. Crim. App. 1997) (citation omitted). "Furthermore, allowances must be made for the fact that officers must often make quick decisions under tense, uncertain and rapidly changing

circumstances." *Id.* Thus, an investigative detention's circumstances, such as safety and security reasons, may reasonably justify an officer transporting the suspect elsewhere for questioning. *See Castro v. State*, 373 S.W.3d 159, 166 (Tex. App.—San Antonio 2012, no pet.) (transporting suspect short distance for investigation is consistent with investigatory detention's purpose); *Turner v. State*, 252 S.W.3d 571, 579 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (handcuffing and transporting suspect thirty minutes to police station did not convert investigative detention to arrest).

Whether the officer's actions were reasonable are judged from the perspective of a reasonable officer at the scene, rather than in hindsight. *Rhodes*, 945 S.W.2d at 118; *Goldberg v. State*, 95 S.W.3d 345, 360 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). Police may use such force as reasonably necessary to accomplish the detention's goal: investigation, maintenance of the status quo, or officer safety. *Rhodes*, 945 S.W.2d at 117. We must first determine whether the detention constitutes an arrest or an investigatory detention since the "nature of the detention determines the applicable constitutional standards." *Castro*, 373 S.W.3d at 164 (citing *Amores v. State*, 816 S.W.2d 407, 411 (Tex. Crim. App. 1991)).

Lieutenant Stowe initially approached the vehicle already stopped in the drive-thru and asked Jordan to identify himself, and he did. This initial interaction constituted a consensual encounter. *See Castleberry*, 332 S.W.3d at 466–67; *Hunter*,

955 S.W.2d at 104. Mitchell's testimony at the suppression hearing, as outlined above, established officers did not use a high degree of force. Video evidence and Mitchell's testimony established that despite a large officer presence, only three approached Jordan and did so individually. Officers did not activate their lights, they spoke calmly, did not draw their weapons, and did not handcuff him. They immediately separated him from his girlfriend and questioned her.

As Mitchell explained, they were investigating two murders that occurred hours before, and multiple connections made them suspicious of Jordan. Mitchell and Adams told Jordan that his name had come up in a murder investigation, and he wanted to know how. Officers wanted to continue investigating to confirm or dispel their suspicions of Jordan. Mitchell explained they were concerned about public and officer safety given the nature of the crime. They wanted to move Jordan to a more secure location so they could continue questioning him. Officers transported him ten minutes to the police station and immediately put him in a room.

Less than ten minutes after arriving, they Mirandized him, and began questioning him about his involvement. Mitchell testified that they investigated whether Jordan had an alibi, whether someone else could have driven the white truck, and whether someone else may have used his SnapChat account. Jordan began by naming another individual who he falsely claimed took his stepfather's truck to buy marijuana. Mitchell testified that as they interviewed him, other officers "spent

63

a considerable amount of time" trying to locate and cross-reference that individual to determine whether he existed. He also testified that Jordan's evasiveness resulted in a longer interview. After almost three hours and being unable to verify the information Jordan provided, he confessed. Jordan's providing false information to officers increased the length of questioning. *See Balentine*, 71 S.W.3d at 771. After he confessed, officers arrested him.

On appeal, Jordan focuses on (1) the fact that Jordan did not believe he had a choice but to go with police and (2) a seeming inconsistency in Mitchell's testimony about whether Jordan was free to leave. First, we note that it is not Jordan's subjective belief or Mitchell's that matters. *See Stansbury*, 511 U.S. at 323; *Monjaras*, 664 S.W.3d at 927; *Furr*, 499 S.W.3d at 878; *Dowthitt*, 931 S.W.2d at 254. Second, Jordan's belief that he was not free to leave is consistent with an investigatory detention. *See Crain*, 315 S.W.3d at 49 (explaining that an investigative detention occurs when an individual yields to an officer's show of authority under a reasonable belief that he is not free to leave).

We have considered the relevant factors of degree of force, detention's duration, nature of the crime, location of the stop, degree of suspicion, and that officers immediately and continually were investigating the crime and attempting to verify information Jordan provided. *See Sheppard*, 271 S.W.3d at 291; *Bartlett*, 249 S.W.3d at 669; *Moore*, 25 S.W.3d at 386. Based on the totality of the circumstances,

we conclude the evidence at the suppression hearing supports that the officers' encounter with Jordan began as a consensual interaction by asking him to identify himself then moved to an investigatory detention when they put him in a police car, transported him to the station, and questioned him. *See Monjaras*, 664 S.W.3d at 927; *Furr*, 499 S.W.3d at 877; *Castleberry*, 332 S.W.3d at 467.

**Reasonable suspicion supported officers' investigative detention of Jordan.**

Having determined this was a consensual encounter that escalated into an investigatory detention, we now turn to whether the officers' conduct was reasonable considering the totality of the circumstances. *See Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011); *see also Matthews v. State*, 431 S.W.3d 596, 603 (Tex. Crim. App. 2014). Under the Fourth Amendment, an officer's "reasonable suspicion" to believe that an individual has been involved in criminal activity will support a brief investigative detention. *Derichsweiler*, 348 S.W.3d at 914; *see also Terry v. Ohio*, 392 U.S. 1, 21–22 (1968). "'A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity.'" *Matthews*, 431 S.W.3d at 603 (citation omitted). "In determining whether an officer has reasonable suspicion to detain, we look at the totality of the circumstances through an objective lens, disregarding the officer's subjective intent." *Id*.

65

During the suppression hearing, Mitchell specified the available facts and why they believed Jordan was involved in the shooting when they approached him at McDonald's. *See id.*; *Derichsweiler*, 348 S.W.3d at 914. We have delineated those facts in detail in our discussion above. Based on the evidence at the suppression hearing, we hold that officers had specific, articulable facts that, combined with rational inferences from those facts, led them to reasonably conclude Jordan was involved in the shooting at the Whistle Stop Café. *See Matthews*, 431 S.W.3d at 603; *Derichsweiler*, 348 S.W.3d at 914. Accordingly, reasonable suspicion supported officers' investigative detention of Jordan. *See Matthews*, 431 S.W.3d at 603; *Derichsweiler*, 348 S.W.3d at 914. Since Jordan was not unlawfully arrested, the trial court did not err in denying his Motion to Suppress Arrest or in admitting the complained-of evidence Jordan argued was tainted by an unlawful arrest. We overrule issue six.

**Jordan has failed to preserve his 38.22 complaint about the voluntariness of his custodial interrogation. Nevertheless, the trial court's findings of fact and conclusions of law that Jordan's confession was voluntary are supported by the record.**

In issue seven, Jordan complains the trial court erred by not suppressing his "custodial statement." In support of this issue, he asserts that although he was "casually" read his Miranda warnings, he was "never asked if he wishes to knowingly, intelligently and voluntarily waive his rights[,]" which constituted a violation of article 38.22. In essence, on appeal Jordan complains about *how* the

66

officers asked him to waive those rights. The State counters that Jordan failed to preserve this complaint for our review. We agree with the State.

Texas Rule of Appellate Procedure 33.1(a) provides that a complaint is not preserved for appeal unless it was made to the trial court "by a timely request, objection or motion" that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context[.]" Tex. R. App. P. 33.1(a); *see also Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009) (citation omitted). Jordan complains on appeal that officers violated article 38.22 section 3(a)(2), which requires that "the accused knowingly, intelligently, and voluntarily waive[] any rights" before an oral custodial statement is admissible. *See* Tex. Code Crim. Proc. Ann. art. 38.22 § 3(a)(2).

The facts before us are like those in *Resendez v. State*. There, the Court of Criminal Appeals concluded neither the appellant's pretrial motions to suppress that generally mentioned article 38.22 nor his arguments at the hearing preserved his complaint on appeal. *See id.* at 313, 316–17. The Court explained that "Article 38.22 contains a number of subsections that could have been applicable to the appellant's videotaped statement. The appellant's argument, however, contained little more than a citation to the statute and did not bring the specific violation of Article 38.22 to the trial court's attention." *Id.* at 313.

As noted above, before trial, Jordan filed his Motion for Hearing on Admissibility of Statement by Defendant addressing Jordan's statement at the police station. That Motion raised various United States and Texas constitutional grounds for excluding the statement and cited Texas Code of Criminal Procedure articles 38.21, 38.22, 38.23, *Jackson v. Denno*, 378 U.S. 368 (1964), and *Wong Sun v. U.S.*, 371 U.S. 471 (1963). The Motion does not mention that Jordan did not "knowingly, intelligently and voluntarily" waive his rights or that the State failed to secure a proper waiver of Jordan's rights. *See* Tex. Code Crim. Proc. Ann. art. 38.22 § 3(a)(2). Rather, the Motion argues that Jordan was "under arrest or substantially deprived" of his freedom and that his statements "were the fruit of illegal arrest and/or search and seizure."

Likewise at the suppression hearing, the parties focused on Jordan's Motion to Suppress Arrest, rather than the voluntariness of his statements. During the suppression hearing, the trial court asked what he was addressing, and Jordan responded that he focused on the Motion to Suppress the Arrest but noted that Mitchell testified he did not try to determine whether Jordan was intoxicated. So, he submitted that for the trial court's "consideration." He did not complain in the suppression hearing that officers never asked him if he "knowingly, intelligently, and voluntarily" waived his rights, the argument he makes on appeal. Rather, he told the trial court the reason he focused on the arrest was that it appeared "the rights

were read to him correctly, and it appears that he waived them[.]" The trial court did not sign an order on the motion to suppress Jordan's statement.

The trial court's article 38.22 findings included that officers read Jordan his rights, and he voluntarily waived them. The trial court also found that Jordan was coherent, not intoxicated or impaired, and his confession was not the product of coercion and was voluntary. These findings are supported by the record. *See Young*, 283 S.W.3d at 873; *Kelly*, 204 S.W.3d at 818. Further, the trial court's conclusions of law included that: (1) Jordan was read the requisite statutory and constitutional warnings at the beginning of the interview, and the totality of the circumstances show that he understood them and "knowingly, intelligently, and voluntarily waived his rights[;]" (2) he did not raise any disputed fact issue concerning the legality of obtaining his statement; (3) his confession did not result from coercion or overreaching; and (4) his confession was voluntary.

The trial court further found that the defendant conceded at the hearing detectives read his rights correctly and he waived them, he did not present any evidence his statement was involuntary, and he instead focused his argument at the hearing on the motion to suppress his arrest. These findings are likewise supported by the record. *See Young*, 283 S.W.3d at 873; *Kelly*, 204 S.W.3d at 818. Since Jordan failed to apprise the trial court of the specific article 38.22, section 3(a)(2) complaint about the voluntariness of his statement that he now raises on appeal, we conclude

he has failed to preserve this for our review. *See* Tex. R. App. P. 33.1(a); *Resendez*, 306 S.W.3d at 316–17; *see also Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (explaining that whether a particular complaint is preserved depends on whether the complaint made on appeal comports with the complaint at trial). We overrule issue seven.

## Issues Nine through Thirteen: Jury Charge

In issues nine through thirteen, Jordan complains the trial court refused to include his requested instructions in the jury charge.

## Standard of Review and Jury Charge Law

A claim of jury charge error involves a two-step analysis. *See Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). We first determine whether the charge is erroneous, then if so, we decide whether the appellant was harmed by the erroneous charge. *See id.*; *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). There are two standards of review for charge error claims. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *see also Alcoser*, 663 S.W.3d at 165. If a defendant timely objects to the alleged error, the record must only show "some harm" to obtain relief. *Alcoser*, 663 S.W.3d at 165; *Almanza*, 686 S.W.2d at 171. If the defendant fails to timely object, the record must show "egregious harm." *Alcoser*, 663 S.W.3d at 165; *Almanza*, 686 S.W.2d at 171. We assess harm "in light of the entire jury charge, the state of the evidence, including

70

the contested issues and weight of [the] probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *see also Alcoser*, 663 S.W.3d at 165. Jury charge error "is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory." *Alcoser*, 663 S.W.3d at 165 (citation omitted). "A finding of egregious harm must be based on 'actual harm rather than theoretical harm.'" *Id.* (citing *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)). Meeting the egregious harm standard is difficult and is a fact-specific analysis. *See id.*; *see also Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). "Neither party bears the burden to show harm." *Alcoser*, 663 S.W.3d at 165 (citation omitted).

The trial court must submit a jury charge "distinctly setting forth the law applicable to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14. The charge should inform the jury of the applicable law and how to apply it to the case's facts. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007) (citation omitted); *see also Alcoser*, 663 S.W.3d at 164–65. "Abstract paragraphs 'serve as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge,' and application paragraphs apply the 'pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations.'" *Alcoser*, 663 S.W.3d at 165 (quoting *Crenshaw v. State*,

71

378 S.W.3d 460, 466 (Tex. Crim. App. 2012)). A defendant is entitled to an instruction on any defensive issue raised by the evidence, regardless of the evidence's strength or credibility. *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). A defensive issue is raised if there is sufficient evidence to support the jury rationally finding each element of the defense. *Id*.

## The trial court properly instructed the jury on self-defense and multiple assailants, and Jordan was not entitled to the requested apparent danger instruction.

In issue nine, Jordan contends the trial court erred when it refused his "specially requested" instruction on self-defense relating to multiple assailants and apparent danger. During the charge conference, Jordan submitted a proposed written instruction on apparent harm and multiple assailants. The State objected that the language was non-statutory and constituted an impermissible comment on the weight of the evidence. The trial court denied the non-statutory apparent danger language but included the multiple assailants wording. On appeal, Jordan argues that "the charge given was too abstract and restrictive in its explanation of the law of self-defense."

"[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(a). As applicable here, a person is justified in using deadly force against another

72

if he would be justified in using force, and he reasonably believes deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of robbery. *See id.* § 9.32(a). "When the evidence viewed from the defendant's standpoint shows an attack or threatened attack by more than one assailant, the defendant is entitled to a multiple assailants instruction." *Jordan*, 593 S.W.3d at 343 (citation omitted). The issue may be raised even as to those who are not aggressors if they seem to be encouraging, aiding, or advising the aggressor. *Id.* "If there is evidence of more assailants than one, the charge must inform the jury that the accused can defend against either, and it is error to require the jury to believe or find that there was more than one assailant attacking the accused." *Black v. State,* 145 S.W. 944, 947 (Tex. Crim. App. 1912); *see also Jordan*, 593 S.W.3d at 345.

Regarding self-defense and multiple assailants, the charge's abstract section instructed the jury as follows:

> Upon the law of self-defense, you are instructed that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against one or more person's use or attempted use of unlawful force.
> A person is justified in using deadly force against another if he would be justified in using force against the other in the first place, as set out above, and when and to the degree he reasonably believes that such deadly force is immediately necessary to protect himself against one or more person's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of robbery.

73

By the term "reasonable belief" as used herein is meant a belief that would be held by an ordinary and prudent person in the same circumstances as the defendant.

By the term "deadly force" is meant force that is intended or known by the persons using it to cause, or in the manner of its use or intended use is capable of causing death or serious bodily injury.

The application portion of the charge addressed multiple assailants and named Rash, York, and Smith. It first instructed the jury to consider whether Jordan committed all the elements of capital murder. The charge then instructed the jury regarding the consequences of its findings or failure to find that Jordan's belief that his conduct was immediately necessary to protect himself against Rash, York, and Smith's "use or attempted use of unlawful deadly force" or to prevent their "imminent commission of the offense of robbery" on the offense of capital murder. It instructed the jury to acquit Jordan unless (1) the State proved that he did not believe his conduct was immediately necessary, or (2) believed his conduct was immediately necessary, but his belief was not reasonable. It then instructed the jury to consider the lesser included offense of murder if it found his belief was reasonable as to one assailant but not the other. Finally, it instructed that if the jury had a reasonable doubt as to whether he was guilty of any offense, they must acquit him.

Here the trial court's charge properly tracked the law of self-defense. *See* Tex. Penal Code Ann. §§ 9.31(a), 9.32(a); *see also* Tex. Code Crim. Proc. Ann. art. 36.14. Since the evidence raised the issue of multiple assailants, the charge likewise

74

instructed the jury that it could consider the conduct of "one or more" people in the application paragraph and named Rash, York, and Smith when determining whether Jordan's conduct was reasonable. *See Jordan*, 593 S.W.3d at 343.

Generally, a trial judge should avoid including non-statutory instructions in the charge because they often constitute impermissible comments on the weight of the evidence. *See Beltran De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019); *Walters*, 247 S.W.3d at 211.

> Jordan requested the following non-statutory apparent danger instruction:
>
> In determining the existence of real or apparent danger, you should consider all the facts and circumstances going to show the condition of the mind of the defendant at the time of the occurrence in question, and in considering such circumstances, you should place yourselves in the defendant's position at the time and view them from his standpoint alone.

Our sister court in Austin concluded the trial court did not err when it refused a nearly identical apparent danger instruction as the one denied in this case. *See Bundy v. State*, 280 S.W.3d 425, 429–31 (Tex. App.—Austin 2009, pet. ref'd). There, the court explained that where a defendant claims self-defense, his rights are fully preserved and the concept of "apparent danger" properly presented when a charge instructs the jury (1) that a defendant's conduct is justified if he reasonably believed the deceased was using or attempting to use unlawful deadly force against him, and (2) correctly defines "reasonable belief." *See id.* at 430 (citations omitted). The charge did so here.

75

We hold the charge properly instructed the jury on the law of self-defense and multiple assailants, and the trial court did not err by refusing to include the nonstatutory apparent danger instruction, which would constitute an impermissible comment on the weight of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 36.14; *see also* Tex. Penal Code Ann. §§ 9.31(a), 9.32(a); *Jordan*, 593 S.W.3d at 343; *Bundy*, 280 S.W.3d at 429–31. We overrule issue nine.

**Jordan was not entitled to an instruction under Texas Penal Code section 9.32(b).**

In issue ten, Jordan complains the trial court erred by denying his requested jury instruction that his actions in self-defense were presumed reasonable per Texas Penal Code section 9.32. *See* Tex. Penal Code Ann. § 9.32(b). The trial court denied the requested instruction for the presumption because he could not meet the third prong and was engaged in criminal activity.

As relevant here, an actor's belief that deadly force was immediately necessary to prevent robbery is presumed to be reasonable if the actor: (1) knew or had reason to believe the person against whom deadly force was used was committing or attempting to commit robbery; (2) did not provoke the person against whom the force was used; and (3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor traffic offense at the time the force was used. *See id.* § 9.32(b)(1)(C), (2), (3). A trial court must instruct the jury on a defensive presumption if sufficient evidence of the facts raise the presumption "unless the

76

court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact[.]" *Id.* § 2.05(b)(1); *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011) (noting same). If the evidence conflicts on relevant matters, then a fact issue may exist requiring submission of the presumption to the jury. *See Morales*, 357 S.W.3d at 8.

SnapChat messages showed that Jordan reached out to buy marijuana from Rash. Mitchell testified to the marijuana purchase, and Jordan admitted the same in the recorded statement played for the jury. The undisputed evidence at trial showed Jordan was engaged in criminal activity when the shooting occurred, since he was attempting to possess marijuana and had taken steps to purchase it. *See* Tex. Penal Code Ann. § 15.01(a) ("A person commits an offense if, with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense."); Tex. Health & Safety Code Ann. § 481.121(a) (making it an offense for a person to knowingly or intentionally possess a usable quantity of marijuana). We hold that since the undisputed evidence established Jordan was otherwise engaged in criminal activity when the shooting occurred, he was not entitled to the presumption. *See* Tex. Penal Code Ann. § 9.32(b)(3). We overrule issue ten.

**Jordan was not entitled to an article 38.22 instruction.**

In issue eleven, Jordan complains the trial court erroneously denied his request for an Article 38.22 instruction. He first contends police unlawfully "arrested" him when they "surrounded" him at McDonald's and had him exit the vehicle but failed to Mirandize him at that time. He sought to suppress the initial confrontation in the McDonald's parking lot and statements he made while at the Conroe police station. Although he was provided statutory warnings before police questioned him at the station, Jordan contends the video recorded statement played for the jury did "not reflect a knowing, intelligent, and voluntary waiver of rights." *See* Tex. Code Crim. Proc. Ann. art. 38.22 § 3(a)(2) (requiring that defendant be warned of his rights and "knowingly, intelligently, and voluntarily" waive them before custodial interrogation if resulting oral confession is to be admissible). In his brief, Jordan cites to article 38.22 § 3(a)(2).

During the charge conference, Jordan's counsel argued that "we are entitled for the jury to be charged on 38.22 of the voluntariness of his statement and whether the rights were sufficiently read and properly waived[.]" Jordan clarified during the charge conference he was "requesting the 38.22, section 7 charge." That provision provides, "When the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement." *Id.* art. 38.22 § 7. Under Texas statutes, there are three types of instructions that

78

relate to the taking of confessions: (1) a "general" article 38.22, § 6 voluntariness instruction; (2) a "general" article 38.22, § 7 warnings instruction (involving warnings given under § 2 and § 3); and (3) a "specific" article 38.23(a) exclusionary-rule instruction. *Oursbourn v. State*, 259 S.W.3d 159, 173 (Tex. Crim. App. 2008). A 38.22, section 7 instruction applies to 38.22, section 2 and 3 requirements and is triggered only when "raised by the evidence." *See id.* at 176. "For it to be 'raised by the evidence' there must be a genuine factual dispute," similar to Article 38.23 issues. *Id.* The section 7 instruction sets out the 38.22, § 2 or 3 requirements and asks the jury to decide whether those requirements were met. *See id.* at 173.

On appeal, he directs us to the following evidence he claims warranted the 38.22, section 7 instruction: (1) Mitchell's trial testimony allegedly contradicted his suppression hearing testimony about whether Jordan was free to leave; and (2) officers told Jordan the statement would benefit him. We disagree that a factual dispute was raised by the evidence the jury considered. First, the only testimony the jury heard from Mitchell was that Jordan was free to leave–it was not made aware of any contradictory testimony in the suppression hearing. Absent a conflict affirmatively raised by the evidence, Jordan was not entitled to an article 38.22, section 7 instruction asking the jury whether they believed the requirements of article 38.22, sections 2 and 3 were met. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 7; *Oursbourn*, 259 S.W.3d at 173. Second, the trial court determined that the evidence

79

failed to affirmatively raise a disputed fact issue about what officers told Jordan. As we have previously noted, the record supports the trial court's Findings of Fact and Conclusions of Law. *See Young*, 283 S.W.3d at 873; *Kelly*, 204 S.W.3d at 818. The video evidence speaks for itself, and the testimony at trial mirrored the video—officers told Jordan it would "behoove" him to come to the station and talk to them or that it would "benefit" him. This was not a contested matter that the jury needed to determine under an article 38.22, section 7 instruction. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 7; *Oursbourn*, 259 S.W.3d at 173.

We conclude that absent a disputed fact issue affirmatively raised by the evidence, Jordan was not entitled to an Article 38.22, § 7 instruction. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 7; *Oursbourn*, 259 S.W.3d at 173. We overrule issue eleven.

**Absent a disputed issue of material fact, Jordan was likewise not entitled to an article 38.23 instruction.**

In issue twelve, Jordan complains that the trial court erred by refusing his requested 38.23 instruction. He complains he was illegally arrested without a warrant, and because of that, he was "not in a position of choice which would allow him to voluntarily waive his rights." He also asserts by denying him the opportunity to determine these issues, he was deprived of "due process and due course of law." He claims that discrepancies in Detective Mitchell's trial testimony compared to his pretrial suppression hearing testimony justify giving the 38.23 instruction. The State

80

responds (1) that whether Jordan was under arrest or merely detained when he confessed is a legal question, (2) Mitchell's suppression hearing testimony was not admitted at trial, so there was no factual dispute for the jury to resolve, and (3) the allegedly disputed evidence Jordan identified when he first requested the instruction was not material to the challenged conduct's lawfulness.

The Code of Criminal Procedure prohibits using evidence obtained in violation of a defendant's legal or constitutional rights. *See* Tex. Code Crim. Proc. Ann. art. 38.23(a); *Ramjattansingh v. State*, 587 S.W.3d 141, 151 (Tex. App.— Houston [1st Dist.] 2019, no pet.). "Evidence is not 'obtained . . . in violation' of a provision of law if there is no causal connection between the illegal conduct and the acquisition of the evidence." *Gonzales v. State*, 67 S.W.3d 910, 912 (Tex. Crim. App. 2002) (citations omitted); *see also Ramjattansingh*, 587 S.W.3d at 151 (explaining that "unlawfully obtained" means a causal connection between the complained-of illegal or unconstitutional conduct and the acquisition of the evidence). If the evidence raises a material fact issue about whether police obtained evidence in violation of the defendant's rights, the trial court must instruct the jury "to disregard that evidence if it believes the evidence was unlawfully or unconstitutionally obtained or if it has a reasonable doubt in this regard." *Ramjattansingh*, 587 S.W.3d at 151 (citing *Jackson v. State*, 468 S.W.3d 189, 199 (Tex. App.—Houston [14th Dist.] 2015, no pet.)).

A material fact issue warranting this instruction exists only when: (1) the evidence heard by the jury raises a fact issue; (2) the evidence about that fact was affirmatively contested; and (3) the contested fact issue was material to the lawfulness of the challenged conduct in obtaining the statement alleged to be involuntary. *Oursbourn*, 259 S.W.3d at 177; *Ramjattansingh*, 587 S.W.3d at 151. Absent a dispute about a material fact, the trial judge alone determines the legality of the conduct as a question of law. *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007). Further, if other undisputed facts are sufficient to support the challenged conduct's lawfulness, then the disputed fact issue is not submitted to the jury because it is immaterial to the evidence's ultimate admissibility. *Id.* The disputed fact must be essential in deciding the challenged conduct's lawfulness. *Id.* at 511. "[T]o obtain a jury instruction under Article 38.23(a), the disputed fact must be one that affects the determination of the legal issue." *Id.* at 517.

If the determination of whether this constituted an investigative detention or an arrest turned on Mitchell's belief that Jordan was not free to leave, then a dispute about that fact would require a jury instruction. *See id.* Jordan again notes alleged discrepancies in Detective Mitchell's trial testimony and suppression hearing testimony about whether Jordan was free to leave. Even if a discrepancy in Mitchell's testimony existed, as explained above, this contradiction was not before the jury. Further, an officer's subjective belief or intent about whether a suspect was

82

free to leave is immaterial to whether (1) Jordan was under arrest at the McDonald's or detained, and (2) whether reasonable suspicion supported the detention. *See Matthews*, 431 S.W.3d at 603 (disregarding officer's subjective intent and looking at totality of the circumstances through an objective lens to determine reasonable suspicion); *see also Stansbury*, 511 U.S. at 323 (explaining custody determination depends on interrogation's objective circumstances, not the subjective views of the person being questioned or the officer); *Monjaras*, 664 S.W.3d at 927 (same); *Dowthitt*, 931 S.W.2d at 254 (same). "[W]hether a defendant was detained pending an investigation is a legal determination for the court to make, rather than a fact issue for resolution by the jury." *Ramjattansingh*, 587 S.W.3d at 159 (citing *Sheppard*, 271 S.W.3d at 291).

We hold the disputed facts that Jordan argues warranted an article 38.23 instruction were immaterial to the challenged conduct's legality, thus the trial court did not err in refusing the instruction. *See Oursbourn*, 259 S.W.3d at 177; *Madden*, 242 S.W.3d at 510; *Ramjattansingh*, 587 S.W.3d at 151. We overrule issue twelve.

### The trial court did not err in refusing to charge the jury on the lesser-included offense of manslaughter.

In issue thirteen, Jordan complains the trial court erred when it refused to charge the jury on the lesser-included offense of manslaughter. During the charge conference, Jordan argued the jury could conclude he acted recklessly. He asserted

83

there was evidence that would allow the jury to decide Jordan did not kill intentionally or knowingly, "but consciously disregarded a substantial and unjustifiable risk," so manslaughter was appropriate. The defense noted Jordan's statement where he said there were three quick shots, and he ran. The State responded no evidence supported an inference that Jordan was only guilty of recklessly killing them or disregarding a substantial and unjustifiable risk that his conduct could cause the result. The State further argued that "the whole trial has been about self-defense which means . . . you are doing so intentionally and knowingly." The trial court refused to include manslaughter in the charge.

Capital murder's requisite mental state is "intentionally or knowingly," whereas manslaughter's culpable mental state is "recklessly." *Compare* Tex. Penal Code Ann. §§ 19.02(b)(1) *and* 19.03(a), *with* § 19.04(a). A person acts recklessly with respect to the result of his conduct "when he is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur." *Id.* § 6.03(c).

As applicable here, a lesser-included offense is one which "differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission." Tex. Code Crim. Proc. Ann. art. 37.09(3). We use the two-step *Aguilar/Rousseau* test to determine whether an instruction on a lesser-included offense should be given. *Ritcherson v. State*, 568 S.W.3d 667, 670 (Tex.

84

Crim. App. 2018); *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012); *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). First, we compare the statutory elements of the alleged lesser offense with the statutory elements and indictment's descriptive allegations. *Ortiz v. State*, 623 S.W.3d 804, 806 (Tex. Crim. App. 2021) (citing *Ritcherson*, 568 S.W.3d at 670–71). Second, we ask whether "'there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense.'" *Id.* (quoting *Bullock v. State*, 509 S.W.3d 921, 925 (Tex. Crim. App. 2016)). This second step requires (1) evidence directly refuting or negating other evidence establishing the greater offense and raising the lesser-included offense, or (2) evidence susceptible to different interpretations, one of which refutes or negates an element of the greater offense and raises the lesser offense. *Ritcherson*, 568 S.W.3d at 6771.

Evidence raising the lesser offense must be affirmatively in the record. *Id.* "[A] defendant is not entitled to a lesser-included offense instruction based on the absence of evidence, and the evidence must be 'directly germane to the lesser-included offense[.]'" *Id.* (citing *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997)). We consider all the evidence admitted at trial, and if more than a scintilla of evidence raises the lesser offense and negates or rebuts an element of the greater offense, the defendant is entitled to a lesser-charge instruction. *Id.*; *Roy v.*

85

*State*, 509 S.W.3d 315, 317 (Tex. Crim. App. 2017). It does not matter whether the evidence is controverted or credible. *Ritcherson*, 568 S.W.3d at 671. In determining whether Jordan had the intent to murder or only caused the deaths recklessly, the sole question "is whether a jury could have reasonably interpreted the record in such a way that it could find Appellant guilty of only manslaughter." *See id.* at 676.

In support of the requested lesser-included instruction on manslaughter, Jordan contends that "evidence suggested the events unfolded rapidly" when he "was confronted by three (3) individuals in the small/confined space of a compact car." He adds that his statement "reflects that only three shots were fired in rapid succession after [he] was startled and frightened by the actions of the other occupants of the vehicle." Jordan also points to the medical examiner's testimony and that she could not provide evidence that the shots were fired intentionally or knowingly or determine where Rash and York were holding their heads. He points to Pinneri's testimony that Rash's and York's recent marijuana use would have affected them. Finally, he argues he had no motive to kill Rash and York, and the fact that he did not take the money in the car shows he acted recklessly.

Even if Jordan shot Rash and York to protect himself in response to provocation, that is not evidence he did not shoot intentionally or knowingly with the intent to kill them. "People acting in self defense often have the intent to kill or to cause serious bodily injury." *Id.* at 678. Likewise, the fact that he fired three shots

into the heads of three different individuals in a confined space rapidly, "does not lend itself to a reasonable inference that [he] acted only recklessly." *See id.* Similarly, the absence of testimony from Pinneri regarding intent or Rash's and York's head positions does nothing to support that Jordan acted only recklessly. Further, evidence that Jordan left the scene *after* the shooting without taking money does not inform the jury of his state of mind when he pulled the trigger. *See Cavazos*, 382 S.W.3d at 385 (explaining that where defendant pulled a gun, pointed it at someone, pulled the trigger twice, fled the scene, and later told a friend he did not mean to did not rationally support an inference that appellant acted recklessly at the moment he fired the shots).

We agree the evidence shows Jordan fired a gun three times in the confined space of a car. Despite his claims of a "chaotic" scene, by his own admission, each of those three shots was separately aimed at the head of everyone in the car and fired at close range. No evidence supports a reasonable inference Jordan believed the gun was incapable of causing death. *See Ritcherson*, 568 S.W.3d at 678 (explaining that where appellant stabbed victim in the chest, no evidence supported a reasonable inference appellant believed the knife was not capable of causing death or serious bodily injury). We conclude there is no reasonable interpretation of the evidence that would allow a jury to rationally find that Jordan acted only recklessly when he shot Rash and York in the head. *See id.*; *Cavazos*, 382 S.W.3d at 386; *see also* Tex. Penal

Code Ann. §§ 19.02(b)(1), 19.03(a), 19.04(a). Absent evidence that is susceptible to an interpretation negating or refuting an element of the greater offense and raising the lesser offense, the second step of the test is not met. *See Ritcherson*, 568 S.W.3d at 671 (discussing requirements of two-step analysis for lesser-included offenses); *Cavazos*, 382 S.W.3d at 386 (concluding second step of analysis was not met). Thus, Jordan was not entitled to a jury instruction on the lesser-included offense of manslaughter, and the trial court did not err in denying it. *See Ritcherson*, 568 S.W.3d at 671; *Cavazos*, 382 S.W.3d at 386. We overrule issue thirteen.

## CONCLUSION

Having overruled all Jordan's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on March 26, 2024
Opinion Delivered August 28, 2024
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.